10-1420-cv
Nagle v. Marron

**UNITED STATES COURT OF APPEALS**

**FOR THE SECOND CIRCUIT**

August Term, 2010

(Argued:  March 24, 2011   Decided:  December 12, 2011 )

Docket No. 10-1420-cv

─────────────────────────────

NANCY L. NAGLE,

*Plaintiff-Appellant*,

– v. –

PAULA MARRON, ROSEMARIE COLETTI, and BARBARA MERLING,

*Defendants*,

– and –

PAUL R. FRIED, individually, STEVEN CASTAR, individually, and MAMARONECK
UNION FREE SCHOOL DISTRICT, NEW YORK,

*Defendants-Appellees*.[1]

─────────────────────────────

Before: CALABRESI, RAGGI, *Circuit Judges*, and GLEESON, *District Judge*.[2]

Nancy L. Nagle appeals from the district court's (Zilly, *J.*) grant of summary judgment to
Appellees. We hold that Nagle has made a *prima facie* showing of retaliation for speech
protected by the First Amendment; that Appellees' rebuttal is subject to credibility questions and
hence cannot be resolved as a matter of law; and that Appellees are not, at this stage of the
proceedings, entitled to qualified immunity.

Vacated and remanded.

─────────────────────────

[1] The Clerk of Court is directed to amend the official caption to read as shown above.
[2] The Honorable John Gleeson of the United States District Court for the Eastern District of New York, sitting by
designation.

JANE BILUS GOULD, Gould & Berg, LLP, White Plains, N.Y., *for Plaintiff-Appellant*.

MAURIZIO SAVOIARDO (Michael A. Miranda *on the brief*), Miranda Sambursky Slone Sklarin Verveniotis LLP, Mineola, N.Y., *for Defendants-Appellees*.

CALABRESI, *Circuit Judge*:

Plaintiff-Appellant Nancy L. Nagle brought suit under 42 U.S.C. § 1983, alleging that Defendants-Appellees Paul R. Fried, Steven Castar, and the Mamaroneck Union Free School District of New York had retaliated against her for exercising her rights under the First Amendment. The court below (Thomas S. Zilly, *Judge*) granted summary judgment to Defendants-Appellees, holding that the speech on which Nagle based her claim was not protected under the First Amendment and that the individual defendants had qualified immunity from suit. The court held, alternatively, that summary judgment would have been appropriate if the speech had been protected, because the District would have fired Nagle even in the absence of the speech.[3] Nagle appeals. For the reasons stated below, we vacate the district court's grant of summary judgment and remand the case to that court.

## BACKGROUND

### I. The Incidents

From 2004 until 2007, Nagle worked as a tenure-track special education teacher at the Chatsworth Avenue School in the Mamaroneck Union Free School District of New York (the "District"). On March 2, 2007, the school's principal, Defendant-Appellee Steven Castar, and the

---

[3] The case was initially assigned to Judge Stephen C. Robinson of the Southern District of New York, but was reassigned to Judge Thomas S. Zilly of the Western District of Washington, sitting by designation in the Southern District of New York, on February 3, 2010. Judge Zilly issued his order following briefing and telephonic oral argument. In addition to Appellees, Nagle's complaint named as defendants Paula Marron, Barbara Merling, and Rosemarie Coletti, all employees of the Mamaroneck Union Free School District. The action was voluntarily discontinued as to those defendants before answers had been filed for them.

2

District's assistant superintendent for human resources, Rosemarie Coletti, informed Nagle that the District's superintendent of schools, Defendant-Appellee Paul Fried, had decided not to recommend her for tenure. Castar and Coletti informed Nagle that, therefore, her probationary employment with the District would be terminated at the end of the school year. Nagle filed suit, claiming that Fried's decision not to recommend her for tenure violated her First Amendment rights because it was made in retaliation for two acts that, she argued, were protected by the First Amendment.

The more recent of these acts took place in January 2007, after Nagle received a copy of a teaching observation report of her class written and signed by the Chatsworth Avenue School's assistant principal, Paula Marron. Nagle had declined to sign the report, but the copy she received appeared to bear her signature. Upon receiving the report, Nagle told Marron, Castar, and John Esposito, the president of Nagle's teachers' union, about the seemingly false signature. After Castar informed him of the alleged forgery, Fried called the police, who determined that no *crime* had been committed. Nevertheless, Nagle and the District separately hired handwriting experts, each of whom concluded that Marron had signed Nagle's name. Thereafter, Fried declined to renew Marron's contract for the following year, and Marron resigned.

The other act on which Nagle based her claim took place during the 2002-2003 school year, while Nagle was a special education teacher in a public school in Henrico County, Virginia. Nagle had reported to her principal in Virginia that she overheard Betty Moore, a teacher in a neighboring classroom, verbally abusing children in her class. Nagle also informed the chair of the Henrico County Early Childhood Special Education Program Department of reports Nagle had gotten from other adults working in the school who had witnessed Moore both verbally and

3

physically abusing children under her care.[4] After a private nurse attending to one of Moore's students reported that she had witnessed Moore strike a child in the chest, Moore resigned from the school, citing family reasons. But Moore kept her teaching license. Nagle then conveyed what she had told school administrators to Virginia's Department of Child Protective Services and to the state police. After a police investigation, Moore was charged with several counts of felony child abuse; she eventually pled guilty to assault.

Nagle's conduct in Virginia took place approximately four years before Superintendent Fried declined to recommend her for tenure in New York; according to record testimony, however, Castar and Fried only learned of Nagle's conduct in early 2007, shortly before Nagle was informed of Fried's tenure decision. Nagle argues that the temporal proximity between Fried's learning of the reported abuse incident and his decision not to recommend her for tenure gives rise to an inference of retaliation. Appellees contend that Fried had already made his decision regarding Nagle's tenure before he found out about her report of abuse in Virginia; thus, the Virginia report played no role in the employment decision.

Instead, they assert, the tenure decision was based on Nagle's alleged behavior during a December 2006 meeting. Over the course of this meeting, Castar raised his concerns regarding two instances where Nagle allegedly violated school protocols. The first involved Nagle choosing a book to read with her class without first consulting the school psychologist; the second involved Nagle sending a child home from school early without first consulting school administrators. Nagle was so distraught by what she heard that she left the meeting crying.

---

[4] Nagle testified that she had been told by other adults working at the school that they had witnessed Moore, *inter alia*, push a child out of a wheelchair, put a child's head underwater in the sink, frequently eat the children's snacks, and often use abusive language with children.

**II. The Opinion Below**

As an initial matter, the district court held that neither the forgery incident, nor the report of abuse were protected under the First Amendment. With respect to the forgery incident, the court determined that because the incident did not involve a crime and may have furthered some "personal agenda" of Nagle's, it was not a matter of public concern and therefore was not protected by the First Amendment. *Nagle v. Fried*, Order, No. 07-cv-2860 (TSZ) (S.D.N.Y. March 19, 2010) ("Order") at 19. With regard to the abuse report, the court held that Nagle's conduct was not protected by the First Amendment "because it undisputedly violated reasonable protocols." *Id.* at 13. The court further opined that, even had Nagle's abuse report been protected at the time it occurred, "due to temporal and geographic remoteness, . . . to the extent it was protected speech when uttered," it "was no longer protected speech when [D]efendants learned of [it] and/or denied her tenure." *Id.* at 16.

The court then held, in the alternative, that Nagle could not prove causation. Specifically, the court determined that the District had "established, as a matter of law, [that it] would have made the same tenure decision in the absence of [Nagle's] expressive conduct," and that therefore summary judgment would be appropriate even were one or both incidents protected under the First Amendment. *Id*. at 22.

On the basis of the holdings described above, the district court granted Castar and Fried qualified immunity from Nagle's suit. The court held that, because Nagle's "expressive conduct did not 'clearly' constitute protected speech," a reasonable official in the position of Castar or Fried "would not have known that considering such conduct in reaching an adverse employment decision" might violate Nagle's rights. *Id*.

**DISCUSSION**

We review a grant of summary judgment *de novo* to determine "whether genuine disputes over material fact exist . . . which should properly be submitted to a jury or whether, where no issues of material fact are found, the moving party is entitled to judgment as a matter of law." *Byrnie v. Town of Cromwell Bd. of Ed.*, 243 F.3d 93, 101 (2d Cir. 2001). We "resolve all ambiguities and draw all inferences in favor of the non-moving party." *Id.*

"To survive a motion for summary judgment on a First Amendment retaliation claim" in the public employment context, "the plaintiff must present evidence which shows '[1] that the speech at issue was protected, [2] that he suffered an adverse employment action, and [3] that there was a causal connection between the protected speech and the adverse employment action.'" *Cotarelo v. Vill. of Sleepy Hollow Police Dep't*, 460 F.3d 247, 251 (2d Cir. 2006) (quoting *Diesel v. Town of Lewisboro*, 232 F.3d 92, 107 (2d Cir. 2000)).[5] "If a plaintiff establishes these three factors, the defendant has the opportunity to show by a preponderance of the evidence that it would have taken the same adverse employment action even in the absence of the protected conduct." *Morris v. Lindau*, 196 F.3d 102, 110 (2d Cir. 1999) (internal quotation marks omitted); *see also Ezekwo v. New York City Health & Hosp. Corp.*, 940 F.2d 775, 780-81 (2d Cir. 1991) (noting that a retaliation claim requires that "the adverse action would not have occurred *but for* the employee's protected actions"). Since courts do not themselves weigh evidence at the summary judgment stage, this standard requires us to determine whether any

---

[5] Other cases have phrased this inquiry as "(1) 'whether the employee spoke as a citizen on a matter of public concern' and, if so, (2) 'whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public.'" *Ruotolo v. City of New York*, 514 F.3d 184, 188 (2d Cir. 2008) (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006)); *see also Anemone v. Metro. Transp. Auth.*, 629 F.3d 97, 114 (2d Cir. 2011) (same). This alternative phrasing divides the same inquiry into different segments, with the protected status of the speech forming one part and the justification, or lack thereof, for adverse action forming the other. The "overarching objectives," however, remain the same: to ensure that "[s]o long as employees are speaking as citizens about matters of public concern, they . . . face only those speech restrictions that are necessary for their employers to operate efficiently and effectively." *Garcetti*, 547 U.S. at 419.

reasonable trier of fact would have to conclude that the evidence was so strongly in the defendant's favor that there remained no genuine issue of material fact for it to resolve. *See Gorman-Bakos v. Cornell Coop. Extension of Schenectady Cnty.*, 252 F.3d 545, 558 (2d Cir. 2001) ("'The function of the district court in considering the motion for summary judgment is. . . only to determine whether there is a genuine issue to be tried.'") (quoting *Vital v. Interfaith Med. Ctr.*, 168 F.3d 615, 622 (2d Cir. 1999)).

In the present case, Appellees do not dispute that the decisions not to recommend Nagle for tenure and to recommend the termination of her probationary employment were adverse employment actions. We must therefore determine whether Nagle's speech was protected under the First Amendment and, if so, whether the evidence presented was sufficient to give rise to an inference of causality. We then examine the record to determine whether Appellees have shown—as a matter of law—that they would have taken the same action in the absence of Nagle's speech, thereby rebutting the requisite causality. Finally, we address whether Castar and Fried are entitled to qualified immunity from Nagle's suit and whether the District may be subject to municipal liability.

**I. First Amendment Claims**

*A.        First Amendment Protections for Public Employees*

"'[W]hile the government enjoys significantly greater latitude when it acts in its capacity as employer than when it acts as sovereign, the First Amendment nonetheless prohibits it from punishing its employees in retaliation for the content of their protected speech.'" *Reuland v. Hynes*, 460 F.3d 409, 415 (2d Cir. 2006) (quoting *Locurto v. Safir,* 264 F.3d 154, 166 (2d Cir. 2001)). Recognizing both that public employees do not "relinquish the First Amendment rights they would otherwise enjoy as citizens" simply because of their public employment, *Pickering v.*

7

*Bd. of Educ.*, 391 U.S. 563, 568 (1968), and that "government offices could not function if every employment decision became a constitutional matter," *Connick v. Myers*, 461 U.S. 138, 143 (1983), courts try "to arrive at a balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering*, 391 U.S. at 568. In *Pickering*, the Supreme Court held that "a teacher's exercise of his right to speak on issues of public importance may not furnish the basis for his dismissal from public employment." *Id.* at 574. In the circumstances of that case, "the interest of the school administration in limiting teachers' opportunities to contribute to public debate [was] not significantly greater than its interest in limiting a similar contribution by any member of the general public." *Id.* at 573.

As *Pickering* indicated, for speech to be protected by the First Amendment, it must be "on a matter of public concern," which includes speech "relating to any matter of political, social, or other concern to the community." *Connick*, 461 U.S. at 146. In contrast, when a public employee "speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest," courts should not "review the wisdom of a personnel decision taken" in response. *Id.* at 147. This is because the First Amendment "does not require a grant of immunity for employee grievances not afforded . . . to those who do not work for the State"; it merely "ensure[s] that citizens are not deprived of fundamental rights by virtue of working for the government." *Id.* To determine "[w]hether an employee's speech addresses a matter of public concern," courts look to "the content, form, and context of a given statement, as revealed by the whole record." *Id.* at 147-48.

More recently, the Supreme Court has held that First Amendment protection applies only when the public employee speaks as a citizen and not in her role as employee. Statements made pursuant to official duties are not protected. *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006). "Restricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen. It simply reflects the exercise of employer control over [speech] the employer itself has commissioned or created." *Id.* at 421-22.

Our Court has explained that, even if a public employee's speech "is not required by, or included in, [his] job description, or [made] in response to a request by the employer," he speaks as an employee and not as a citizen if the speech is "'part-and-parcel of his concerns' about his ability to 'properly execute his duties.'" *Weintraub v. Bd. of Educ.*, 593 F.3d 196, 203 (2d Cir. 2010) (quoting *Williams v. Dallas Indep. Sch. Dist.*, 480 F.3d 689, 694 (5th Cir. 2007)). *Weintraub* held that the filing of a union grievance by a teacher, regarding school administrators' handling of discipline problems in his classroom, was not protected because it implicated the teacher's "core duties" of "maintaining class discipline." *Id.* at 198.

*B.     First Amendment Protection for Nagle's Expressive Conduct*

In applying these principles to Nagle's complaints of forgery, we need go no further than the public-concern prong of analysis, because, like the district court, we conclude that Nagle fails, as a matter of law, to satisfy this requirement. As to Nagle's report of abuse, defendants conceded in the district court that these statements would have enjoyed First Amendment protection when uttered had Nagle not violated school protocols, and they do not argue otherwise here. Thus, we need not pursue the question of whether the reports could claim First Amendment protection, except insofar as the district court ruled that First Amendment protection for these

statements was lost because of (1) non-compliance with employer protocols, and (2) the passage of time and distance between their utterance in Virginia and the complained-of adverse employment action in New York. After analyzing the relevant considerations, we determine that, for the reasons stated below, the New York forgery accusation was not protected speech, but that the Virginia abuse report is.

1.     The Forgery Incident

Nagle argues that any personal interest she may have had in speaking about the forgery incident does not do away with whatever First Amendment protection the speech is entitled to. We agree that the primary question for First Amendment purposes is whether the matter is of public concern, not whether the speech was also made to serve some private interest. *Cf. Reuland*, 460 F.3d at 415 (holding that the absence of a motivating "desire to address a matter of public concern" was "not dispositive as to whether [the] speech addressed a matter of public concern"). Nagle further argues that the fact that the forgery was not considered criminal activity by the police does not by itself negate First Amendment protection. We, similarly, do not "doubt that non-criminal activities may also be . . . matters of public concern." *Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Educ.*, 444 F.3d 158, 164 (2d Cir. 2006).

Accordingly, we believe that the district court erred in its conclusion that because Nagle's speech about the forgery "was not focused on the public welfare" but was instead "advanc[ing] some . . . personal agenda," that speech necessarily was not protected. *Order* at 19. The court below also erred in stating that because "no authority . . . would treat the events at issue as a crime," the speech could not be of public concern. *Id.* at 16. The district court's reasoning contradicts *Reuland*'s holding that motivation is not dispositive and *Cioffi*'s conclusion that matters of public concern need not involve crimes.

10

Nevertheless, we conclude that the forgery incident did not implicate a matter of public concern. No authority supports Nagle's argument that reporting an alleged crime always implicates matters of public concern. The forgery of Nagle's signature, even if such conduct were criminal, had no practical significance to the general public. As Nagle well understood, her signature did not indicate agreement with the document or have any other effect beyond confirming its receipt—which is not disputed. Viewed in the light most favorable to Nagle, the evidence suggests (a) that Assistant Principal Marron forged Nagle's signature on the document, (b) that Marron then denied having done so, and (c) that Marron did this even though Nagle's signature had no bearing on the report's efficacy. Although Nagle's own desire to get to the bottom of this puzzling situation is understandable, Nagle does not claim that the forgery revealed an ongoing pattern of conduct or even a particularly important instance of bad judgment on Marron's part that might have elevated the forgery to a matter of public concern. We therefore affirm, albeit on different grounds, the district court's holding that Nagle's speech related to the alleged forgery was not protected under the First Amendment.

2. The Abuse Report

*a. Protocol Violations*

Defendants conceded below that Nagle's report of abuse in Virginia raised a matter of public concern, but the district court concluded that the report "was not protected when uttered because it undisputedly violated reasonable protocols." *Order* at 13. We doubt that this question could be decided as a matter of law on the present record, which indicates that Nagle may well have followed school procedures by reporting to her principal the verbal abuse that she had overheard. Some time later—after Moore had already left Nagle's school—Nagle informed both Child Protective Services and the state police of what she had personally overheard and what

11

others had told her. It is not clear from the record that Nagle's conduct in these circumstances violated any protocols.

This lack of factual clarity does not matter, because the district court's reasoning finds no support in Second Circuit or Supreme Court case law, which has never conditioned First Amendment protection on adherence to employer protocols. An employee's failure to follow protocols may give rise to an alternative, non-retaliatory ground for an adverse employment action. And as such, it could be the basis of a successful causation defense. That possibility, which is discussed *infra*, is very different from the lower court's holding that failure to abide by rules deprived the speech of First Amendment protections. Here, as it did also with respect to "obsolescence," *see infra* subsection B.2.b., the district court confused a question of causation with the very different question of whether speech is protected.

In sum, neither the record nor the law permitted the district court to find that Nagle's Virginia speech lost its First Amendment protection because of protocol violations. Defendants conceded below that Nagle's report of abuse would have been protected when uttered but for the alleged protocol violation. We therefore need only consider defendants' remaining argument that the report lost its First Amendment protection due to obsolescence.

### b. Obsolescence of First Amendment Protection

The district court held that Nagle's Virginia speech presented a "'transferred speech' scenario." *Order* at 10.[6] This, it said, required the court to determine not only whether Nagle's report of abuse was "protected when originally uttered" in Virginia, but also, separately, whether it "remained protected after the passage of time and [Nagle's] relocation to a new community." *Id.* at 10-11. The court concluded that, even had Nagle's Virginia speech been protected when it

---

[6] Although the district court put "transferred speech" in quotation marks, we have been unable to locate the term in any other federal or state court decision.

12

was first made, it had become "old news" by the time of the events at issue in this lawsuit. It would therefore have lost, in New York, any First Amendment protection it might have had in Virginia. *Order* at 16. The district court cited no authority for its conclusion that the situation required two separate determinations with respect to First Amendment protection.[7] This novel approach is neither necessary nor warranted by First Amendment law.

The district court appears to have confused the first prong of the First Amendment inquiry, which asks whether the speech at issue was protected, with the last, which examines whether the protected speech caused the adverse employment action. Whether speech pertained to a matter of public concern and whether it was uttered in the speaker's capacity as a private person are not facts that change over time. A teacher's expressive conduct made in the course of working for a candidate's political campaign, for instance, would constitute protected speech even if the candidate lost and his candidacy therefore ceased being a matter of immediate public concern. And the speech would remain protected if the teacher moved to an area where the candidate had not been on the ballot. The First Amendment protects precisely such public participation, both at the time it occurs and ever after.

What can grow stale, over time and distance, is not an expressive act's First Amendment protection but its *relevance* to the plaintiff's employers. "To establish causation, a plaintiff must show that the protected speech 'was a substantial motivating factor in the adverse employment action.'" *Cioffi*, 444 F.3d at 167 (quoting *Morris*, 196 F.3d at 110). It is quite plausible that an

---

[7] The district court did cite *Ashcroft v. ACLU*, 535 U.S. 564 (2002), in support of its conclusion that, just as "community standards" play a role in determining what constitutes obscenity, "time and place must play a role in deciding what constitutes a 'matter of public concern.'" *Order* at 15. Time and place, the court argues, must play a role because "the scope of public concern, like the standards of decency [in obscenity cases], might differ significantly from one community and/or era to another." *Id*. The court cited no authority for its assumption that the "community" that defines standards of decency in criminal obscenity cases has anything to do with the "public" who defines speech to be of public concern in First Amendment retaliation cases. Additionally, *Ashcroft* assumed that what constituted community standards was a fact question to be decided by a jury, a conclusion that would have precluded summary judgment in the present case in any event. *See Ashcroft*, 535 U.S. at 574.

13

employer would simply have no interest, or lose any interest it once had, in an employee's long-ago protected speech. Speech that did not matter to an employer would likely not be a motivating factor in an employment action. And we may assume that this is what the district court meant when it made the factual determination that Nagle's actions would have been "old news" and of "limited interest" to Appellees. *Order* at 16. But that says nothing about whether the speech was protected. The inquiry into causation is legally, as well as logically, distinct from the question of whether the speech was protected to begin with and must be kept separate from that preliminary question.

### c. *Causation*

The district court concluded that Nagle's speech could not have caused the adverse employment action because Fried had already decided not to recommend her for tenure before he learned of her Virginia speech: "[a]lthough Superintendent Fried cannot recall exactly when he became aware of [Nagle's protected speech in Virginia], he believes he was, at the time, already leaning toward not recommending [Nagle] for tenure." *Order* at 20. This testimony, however, by itself, indicates that a grant of summary judgment against Nagle is reversible error.

First, it is established that an adverse employment action occurs on the date that a decision was formally reached. *Cioffi*, 444 F.3d at 163 (holding that an adverse employment action dated not from a closed meeting at which an "informal consensus" regarding the matter was reached, but rather from an official meeting with a formal vote and a publicly declared outcome). Events leading up to a formal decision will, in many situations, be relevant to the analysis of causation. But an employer cannot insulate itself from liability at the summary judgment stage simply by asserting that an adverse employment decision had in fact already been made, without being memorialized or conveyed to anyone, before the employer learned of the

14

protected conduct.[8] Nagle was informed that she would not be recommended for tenure on March 2, 2007. On the facts of this case, that is the date on which the adverse employment action took place.

Second, and as important, Fried did not testify that a decision had already been made, or even that a consensus had been reached, not to retain Nagle when the information about the Virginia events reached him in early 2007. All Fried said was that he was leaning that way.[9] In such circumstances, a jury would be entitled to find that the Virginia events convinced him to follow his inclinations, and thereby played a part in his ultimate decision.

A "plaintiff can . . . establish a causal connection to support a . . . retaliation claim by 'showing that the protected activity was closely followed in time by the adverse [employment] action.'" *Gorman-Bakos*, 252 F.3d at 554 (alteration in original) (quoting *Reed v. A.W. Lawrence & Co.*, 95 F.3d 1170, 1178 (2d Cir. 1996)); *see also Higdon v. Jackson*, 393 F.3d 1211, 1220 (11th Cir. 2004) (noting that causality can be shown through a "close temporal proximity between [the employer's] awareness [of protected conduct] and the adverse action" (internal quotation marks and alteration omitted)); *Wyatt v. City of Boston*, 35 F.3d 13, 16 (1st Cir. 1994) (per curiam) ("One way of showing causation is by establishing that the employer's knowledge of the protected activity was close in time to the employer's adverse action.").

---

[8] At any rate, the record evidence the Appellees cite does not support an assertion along these lines. Appellees claim that "[i]n January 2007, Fried informed Castar, Assistant Superintendent for Personnel Rosemarie Coletti… and the 'central staff team' of his decision not to recommend the appellant for tenure." Appellees' Br. 12. Yet, Fried testified that he "d[id]n't recall" when he told the others of his decision. Coletti testified that Fried "indicat[ed] . . . . he was . . . thinking about what his decision was going to be" at a meeting in January, but informed her in "another conversation . . . that he . . . had decided that he would not be granting Ms. Nagle tenure." She did not state when this other conversation took place.

[9] Fried's full testimony was first that in January 2007 he was "very, very concerned and was heavily leaning toward not granting [Nagle] tenure" and that "it was very doubtful that I was going to be looking to grant [Nagle] tenure." He later said he had in fact "made the decision that [Nagle] would not receive tenure" by that time. A jury could, of course, believe the first rather than the second statement. And this is so apart from the evidence, produced by Appellees themselves, *infra* n.12 and accompanying text, that their mischaracterization of Nagle's Virginia acts as violating protocol did in fact affect their decision.

15

Fried testified that he became aware of Nagle's report of abuse in Virginia in "late January or February" of 2007, that is, at most six weeks before the adverse employment action on March 2, 2007. While we have not "drawn a bright line" defining the maximum time period that can give rise to an inference of causation, *Gorman-Bakos*, 252 F.3d at 554, six weeks fits comfortably within any line we might draw. It follows that Nagle's showing of temporal proximity suffices to make out a *prima facie* claim of retaliation under the First Amendment.

Appellees counter that, to the extent Nagle's Virginia speech influenced them, it was not the content of that speech that mattered but what they took to be Nagle's violation of school rules in reporting the abuse to the police rather than to her principal. But on the question of whether *protected speech* played a significant part of the decision to dismiss Nagle, this "counter," if anything, is evidence against Appellees' position. Just what Appellees believed about Nagle's conduct in Virginia, and how, if at all, those beliefs influenced their actions may well be issues critical to resolving this case.[10] That these questions turn on unresolved factual disputes, however, precludes summary judgment.

Appellees characterize Castar and Fried's understanding of Nagle's Virginia speech as "mirror[ing] Castar's experience with [Nagle's] failing to follow . . . District[] protocol on two occasions" in New York, a claim they rest on two specific events. Appellees' Br. 29. The factual bases Appellees present, however, are insufficient to dispose of the question at summary judgment. On one cited occasion, Nagle chose a particular book to read with her class without first consulting the school psychologist, Barbara Merling. Beyond stating that Merling "believed that [Nagle] should have consulted with her," however, Appellees have provided no evidence

---

[10] Because Castar and Fried did not recall exactly what sources about Nagle they had seen, there is uncertainty as to whether they knew that Nagle had first reported her concerns to her principal in Virginia, and a jury could find that they did. If Castar and Fried did know that Nagle had followed whatever "inside" reporting rules existed in Virginia, and had only then gone to the police and the Department of Child Protective Services, then Appellees' characterization of what Nagle did—which they concede may have caused them to dismiss her—as a rule violation was both wrong and unreasonable.

16

that school customs or protocols required such a consultation. On the second occasion, Nagle did not confer with administrative staff before sending a child home from school early. But Principal Castar himself testified that Nagle's decision to send a child home early without speaking to administrators did not violate any existing rules, protocols, or customs at the school. While, with further factual development, a jury could conceivably conclude that these events caused Appellees in good faith to question Nagle's judgment and her amenability to supervision, Appellees have not presented sufficient evidence to dispose of this question at summary judgment.

### d. Same Decision Defense

Because protected speech could not substantially cause an adverse action if the employer would have taken that action in any event, a defendant can rebut a *prima facie* showing of retaliation by demonstrating "by a preponderance of the evidence that it would have taken the same adverse employment action 'even in the absence of the protected conduct.'" *Morris*, 196 F.3d at 110 (quoting *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)). Under this standard, at this stage of the proceedings, Appellees are entitled to summary judgment if they can show that a reasonable jury would have to find by a preponderance of the evidence that Appellees would have dismissed Nagle even had they not learned of her Virginia speech.

Appellees specifically point to *Cosgrove v. Federal Home Loan Bank of New York*, Nos. 90-civ-6455 (RPP), 92-civ-4225 (RPP), 1999 WL 163218 (S.D.N.Y. Mar. 23, 1999), as "directly analogous" to the present case. In *Cosgrove*, a bank examiner claimed her employer had impermissibly fired her for reporting to the FBI improper lending practices that the examiner had discovered in an investigation. The plaintiff in that case had received numerous indications

17

(several memoranda, evaluations, and warnings per year) that her work failed to meet her employer's standards and that her interpersonal skills were interfering with her job performance. *Id.* at \*12-\*14. The district court concluded in *Cosgrove* that, although the plaintiff's FBI report may have constituted protected speech, the plentiful documentation of her ongoing problems showed as a matter of law that her employer would have fired her irrespective of the FBI report. *Id.* at \*15.

Unlike *Cosgrove*, however, Appellees themselves have characterized evaluations of Nagle during her probationary period as "ranging from fair to positive." Fried testified that official "in-classroom observations [of Nagle] were positive." Also in contrast to the plaintiff in *Cosgrove*, Nagle had not received years of warnings about problems with her interpersonal skills. On the contrary, Castar testified that, besides a complaint from the school psychologist regarding Nagle's choice of a particular book to read with her class, "[t]here weren't complaints" about Nagle. He further testified that, as the school implemented a new teaching model that integrated special education students into the mainstream student population, "other teachers told [him] that they would not teach in this program unless [Nagle] was the special ed teacher there." Defendants have, in sum, provided no evidence of ongoing problems with Nagle's work or work relationships of the sort documented in *Cosgrove*.

According to Fried's testimony, his decision not to recommend Nagle for tenure rested not on an accumulation of negative evaluations and problems but on what he heard from third parties about Nagle's behavior at a single meeting in December 2006. At that meeting, Nagle had intimated that she knew she would not be granted tenure and had become so upset that she cried and left the room for a while to calm down. At one point—and in tension with some of the other testimony regarding the effect of the Virginia events—Fried testified that he "came to the

18

conclusion that [Nagle] should not receive tenure because of her behavior at the meeting." Fried did not himself attend this meeting but learned of it from conversations with Castar and Esposito.

Viewing this record in the light most favorable to Nagle, we cannot find as a matter of law that Fried would have made his decision irrespective of learning of Nagle's report of abuse in Virginia. There was no pattern of bad evaluations, complaints, and warnings, as there was in *Cosgrove*. There was no specific instance of misconduct. All this is in direct contrast with most of the cases Appellees cite to support their position. Moreover, there is no documentation of Fried's decision-making process prior to learning of Nagle's Virginia speech. While it is certainly possible that an employee's behavior at a single meeting can be so egregious as to merit dismissal, we do not think that crying and leaving the room to calm down suffices, as a matter of law, to overcome a *prima facie* showing of retaliation. The record raises genuine issues of material fact as to why Appellees acted as they did, and "[s]ummary judgment is precluded where questions regarding an employer's motive predominate in the inquiry regarding how important a role the protected speech played in the adverse employment decision." *Morris*, 196 F.3d at 110.[11]

**II. Limitations on Liability**

Nagle's successful presentation of a *prima facie* claim and Appellees' proffer of a rebuttal that is subject to credibility questions do not, however, fully resolve this appeal. We must also determine whether each of the particular Appellees may be held liable for the acts alleged. Specifically, we must examine (1) whether Castar and Fried are entitled to qualified

---

[11] Appellees additionally state that any speech protections Nagle might have enjoyed were outweighed by "the employer's interest in maintaining an efficient and disrupti[on] free workplace." An employer can avoid liability for retaliation if it shows that it reasonably predicted that the plaintiff's speech would be disruptive, the disruptive potential outweighed the value of the speech, and the adverse employment action was taken not in retaliation but to prevent disruption. *See Anemone*, 629 F.3d at 115. Appellees, however, have not attempted to show any of these facts. Moreover, this argument was not raised below, and is therefore forfeited. *Order* at 9 (noting that "defendants have not asserted the 'potential disruption' defense").

19

immunity from Nagle's suit, and (2) whether the District is subject to municipal liability in the circumstances of this case.

*A.     Qualified Immunity*

Although the statutory text of § 1983 provides for no immunities, it has been read "'in harmony with general principles of tort immunities'" to provide qualified immunity for most government officials.[12] *Malley v. Briggs*, 475 U.S. 335, 339 (1986) (quoting *Imbler v. Pachtman*, 424 U.S. 409, 418 (1976)). "Qualified immunity is 'an entitlement not to stand trial or face the other burdens of litigation.'" *Saucier v. Katz*, 533 U.S. 194, 200 (2001) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)), *modified by Pearson v. Callahan*, 555 U.S. 223 (2009). It "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson*, 555 U.S. at 231 (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982)). "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id.*

In the present case, the district court granted Fried and Castar immunity. Having determined that neither instance of Nagle's expressive conduct was protected, and certainly was not "clearly" so, the court necessarily concluded that a reasonable official would not have been on notice that "considering such conduct in reaching an adverse employment decision violated" Nagle's rights. *Order* at 22. Because we hold that one of Nagle's acts of expressive conduct was

---

[12] The statute provides, in pertinent part, that "[e]very person who, under color of any statute . . . of any State . . . , subjects, or causes to be subjected, any . . . person within the jurisdiction [of the United States] to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress." 42 U.S.C. § 1983.

protected, we must revisit the district court's decision on qualified immunity. We conclude that neither Fried nor Castar have such immunity.

Qualified immunity depends on whether, "[t]aken in the light most favorable to the party asserting the injury, . . . the facts alleged show the [official's] conduct violated a . . . right," and, if so, whether that right was "clearly established" at the time of the events at issue. *Saucier*, 533 U.S. at 201. As indicated previously, we have no difficulty in concluding that, taking Nagle's allegations as true and resolving all ambiguities and drawing all inferences in her favor, the facts she alleges, if proved, constituted a violation of her right not to experience an adverse employment action in retaliation for speaking as a private person on a matter of public concern. We therefore turn to the other prong of the test.

"The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable [official] that his conduct was unlawful in the situation he confronted." *Id*. at 202. This standard requires "the level of generality at which the relevant 'legal rule' is . . . identified" to strike the appropriate "balance . . . between the interests in vindication of [private persons'] constitutional rights and in public officials' effective performance of their duties." *Anderson v. Creighton*, 483 U.S. 635, 639 (1987) (internal quotation marks omitted). That level of generality must allow officials "'reasonably [to] anticipate when their conduct may give rise to liability.'" *Id.* at 646 (alteration in original) (quoting *Davis v. Scherer*, 468 U.S. 183, 195 (1984)). Describing the right at issue overly broadly eviscerates the protections of qualified immunity; describing it too narrowly negates the possibility of redress. The Supreme Court has, therefore, required the rights at issue in such cases to be sufficiently "particularized" to be "relevant" to the inquiry: "The contours of the right must

21

be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* at 640.

At the same time, the standard must not be so specific that qualified immunity could be overcome only if "the very action in question has previously been held unlawful." *Id.* Rather, "the unlawfulness" of the alleged action "must be apparent" to a reasonable official "in the light of pre-existing law." *Id.*; *see also Saucier*, 533 U.S. at 202 ("If the law did not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate.").

The "subjective good faith of government officials" plays no part in the inquiry. *Harlow*, 457 U.S. at 816. Our "inquiry is confined to the objectively ascertainable question whether a reasonably well-trained [official] would have known that [his conduct] was illegal." *Malley*, 475 U.S. at 345 (internal quotation marks omitted). "Implicit in the idea that officials have some immunity . . . is a recognition that they may err" and a determination that "it is better to risk some error . . . than not to . . . act at all." *Scheuer v. Rhodes*, 416 U.S. 232, 242 (1974), *abrogated by Harlow*, 457 U.S. 800 (1982). The objective inquiry allows room for error by guaranteeing officials "immunity for reasonable mistakes as to the legality of their actions," *Saucier*, 533 U.S. at 206, but not for unreasonable mistakes, which should be prevented by an official's knowledge of the "law governing his conduct," *Harlow*, 457 U.S. at 819. The reasonableness of the official's action, in turn, is "assessed in light of the legal rules that were clearly established at the time [the action] was taken." *Anderson*, 483 U.S. at 639 (internal quotation marks and citation omitted). The focus therefore remains on whether, at the time of the alleged conduct, the right was clearly established, rendering it objectively unreasonable for an official to think that his action was lawful. *See Okin v. Vill. of Cornwall-on-Hudson Police*

*Dep't*, 577 F.3d 415, 433 n.11 (2d Cir. 2009) (noting that an official "who violates clearly established law necessarily lacks an objectively reasonable belief that his conduct was lawful"); *Locurto*, 264 F.3d at 169 ("[I]t can never be objectively reasonable for a governmental official to act with the intent that is prohibited by law.").

In the present case, Appellees do not argue that Nagle did not have a clearly established right not to suffer adverse employment actions in retaliation for her protected speech. Rather, they argue that it is not clearly established that speech protected at one time "remains protected when discovered years later" in a "geographically remote community."[13] Appellees cite no cases suggesting that First Amendment protection wanes over time. More importantly, they point to no basis on which a reasonable official might conclude that it would so wane, thereby permitting the official to retaliate for the speech. As we have previously observed, there are material questions of fact in this case as to whether the complained-of tenure decision was made in retaliation for Nagle's speech. But assuming, as we must, that this causation question is decided against Appellees at trial, no reasonable official could think that such speech-retaliatory conduct was constitutionally permissible based simply on the passage of time. Insofar as Appellees mean to rest on the cases cited by the district court in its discussion of this issue, we note that none of those cases held, or even supported the conclusion, that First Amendment protection deteriorates

---

[13] Appellees also contend that Nagle has failed to show improper motive. To the extent Appellees reference motive as indicative of causation, we have already explained that material questions of fact preclude resolution of the causation issue as a matter of law. Otherwise, as we have also explained, subjective motive plays no part in the qualified immunity inquiry. To the extent that Appellees argue otherwise on the basis of *Blue v. Koren*, 72 F.3d 1075 (2d Cir. 1995), they misconstrue that decision's discussion of motive. *Blue* concluded that, where "a constitutional claim contains a subjective component," *id.* at 1082, "a conclusory proffer of an unconstitutional motive should not defeat the motion for summary judgment" *if* the court determines that "the conduct was objectively reasonable." *Id.* at 1084. Because "[t]he reasonableness of the conduct is itself substantial evidence in support of the motion" for summary judgment, a plaintiff in such a situation may be required to allege more specific facts about the official's motivation. *Id.* But subjective intent has no role in the initial determination of whether the conduct was objectively reasonable.

over time and space. On the contrary, every case the district court cited held or assumed that earlier expressive acts could give rise to a claim of retaliation.

It is true that no case in our Circuit has specifically held that First Amendment protection does not grow weaker over time and space. But as the Supreme Court has explained, "the very action in question" need not have been the subject of a holding in order for a right to be clearly established. *Anderson*, 483 U.S. at 640. If the "contours of the right [are] sufficiently clear," *id.*, then "officials can still be on notice that their conduct violates established law even in novel factual circumstances," *Hope v. Pelzer*, 536 U.S. 730, 741 (2002).

Fried and Castar knew or should have known that retaliation for protected speech would violate an employee's First Amendment rights, and they had no reason to think that speech protected in Virginia in 2004 would *not* be protected in New York in 2007. We therefore hold that, based on the record on appeal, neither Fried nor Castar are subject to qualified immunity from Nagle's suit.[14]

*B.* *Municipal Liability*

The parties did not brief, and the district court did not determine, the availability of a § 1983 suit against the District under the circumstances of this case. Municipal entities, including school districts, are "persons" within the meaning of § 1983 and therefore subject to suit under that provision. *Monell v. Dep't of Soc. Serv. of City of New York*, 436 U.S. 658, 663 (1978); *Back v. Hastings on Hudson Union Free Sch. Dist.*, 365 F.3d 107, 128 (2d Cir. 2004). But municipalities are not liable "on a *respondeat superior* theory," simply because an employee committed a tort. *Monell*, 436 U.S. at 691. Section 1983 "distinguish[es] acts of the *municipality*

---

[14] Since there is no basis in the record for finding that there was a protocol violation, we need not decide whether, if there were such a violation, that violation would become a basis for a qualified immunity defense.

24

from acts of *employees* of the municipality," and imposes liability only for "action for which the municipality is actually responsible." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479 (1986).

The municipality is responsible if a violation of rights resulted from the "government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy." *Monell*, 436 U.S. at 694. When "'an official has final authority over significant matters involving the exercise of discretion, the choices he makes represent government policy.'" *Clue v. Johnson*, 179 F.3d 57, 62 (2d Cir. 1999) (quoting *Rookard v. Health & Hosps. Corp.*, 710 F.2d 41, 45 (2d Cir. 1983)). Because of this, "municipal liability may be imposed for a single decision by municipal policymakers." *Pembaur*, 475 U.S. at 480. "[W]hether an official had final policymaking authority is a question of state law." *Id.* at 483 (plurality opinion); *see also Jett v. Dallas Ind. Sch. Dist.*, 491 U.S. 701, 737 (1989).

Under New York law, boards of education or trustees of common school districts appoint teachers "upon the recommendation of the superintendent of schools, for a probationary period of three years." N.Y. Educ. Law § 3012(1)(a). This probationary period "may be discontinued at any time . . . on the recommendation of the superintendent of schools, by a majority vote of the board of education or the trustees of a common school district." *Id.* At the end of the probationary term, "the superintendent of schools shall make a written report to the board of education" recommending the grant or denial of tenure. *Id.* § 3012(2). The board or the trustees "shall review all recommendations not to appoint a person on tenure." *Id.* § 3031(a).

The District is clearly a final policymaker with respect to a teacher's tenure and employment, and Nagle does not allege that the District acted with intent to violate her rights. Nevertheless, because "no potential employee can obtain full school board approval without [the superintendent's] recommendation," Superintendent Fried may himself be deemed the "final

decisionmaker with respect to personnel appointments," because "his recommendations are essentially those of the governmental body." *Hamilton v. Montgomery Cnty. Bd. of Educ.*, 122 F. Supp. 2d 1273, 1289 (M.D. Ala. 2000).

Additionally, the record suggests that, although Fried technically recommended candidates on whom the District board voted, that process was treated largely as a formality. Accordingly, a factfinder could decide that a person whom Fried did not recommend for tenure was effectively denied tenure by that act. Fried himself testified that he "had made the decision that [Nagle] would not receive tenure." A jury could conclude from this and similar testimony that the District customarily accepted the superintendent's recommendations against tenure.

Some Circuits have held that "an employer cannot shield itself from liability . . . by using a purportedly independent person or committee as the decisionmaker where th[at] decisionmaker merely serves as the conduit, vehicle, or rubber stamp by which another achieves his or her unlawful design." *Dedmon v. Staley*, 315 F.3d 948, 949 n.2 (8th Cir. 2003). Under this so-called "cat's paw" theory,[15] a final decisionmaker that relies entirely on an improperly motivated recommendation from a subordinate may render the municipality liable because the subordinate, although not formally delegated the power to make decisions, acts as the municipality's agent.[16]

---

[15] The term "cat's paw" is apparently drawn from a La Fontaine poem (perhaps itself drawn from an Aesop fable) about a monkey who convinces a cat to get chestnuts roasting in a fire. As the cat pushes the chestnuts out one by one, the monkey eats them; the monkey gets the chestnuts while the cat gets only burnt paws. *See Staub v. Proctor Hosp.*, 131 S. Ct. 1186, 1190 n.1 (2011). "'Today the term 'cat's paw' refers to one used by another to accomplish his purposes.'" *Arendale v. City of Memphis*, 519 F.3d 587, 604 n.13 (6th Cir. 2008) (quoting *EEOC v. BCI Coca-Cola Bottling Co.*, 450 F.3d 476, 484 (10th Cir. 2006)).

[16] The Supreme Court has recently indicated its approval of this approach in a case involving discrimination under the Uniformed Services Employment and Reemployment Rights Act (USERRA), 38 U.S.C. § 4311(c). *Staub*, 131 S. Ct. at 1194 ("We . . . hold that if a supervisor performs an act motivated by antimilitary animus that is *intended* by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable under USERRA." (footnote omitted)). *Staub* noted that USERRA is "very similar to Title VII." *Id.* at 1191. In certain circumstances, we have analogized Title VII to § 1983. *E.g. Demoret v. Zegarelli*, 451 F.3d 140, 149 (2d Cir. 2006) ("[T]he analysis for [§ 1983 employment discrimination claims] is similar to that used for employment discrimination claims brought under Title VII . . . .").

Moreover, several Circuits have either held or assumed that cat's paw liability would be available under § 1983. *See, e.g.*, *Campion, Barrow & Assocs., Inc. v. City of Springfield, Ill.*, 559 F.3d 765, 771 (7th Cir. 2009) ("[E]vidence could support a finding that X (the [City] Council) relied on Y's (the Mayor's or [an alderman's]) intent, making it permissible to base municipal liability on Y's discriminatory animus."); *Arendale v. City of Memphis,* 519 F.3d 587, 604 n.13 (6th Cir. 2008) ("When an adverse hiring decision is made by a supervisor who lacks impermissible bias, but that supervisor was influenced by another individual who was motivated by such bias, this Court has held that the employer may be held liable under a 'rubber-stamp' or 'cat's paw' theory of liability."); *Dedmon*, 315 F.3d at 949 n.2 ("[A]n employer can be liable, under certain circumstances, where the formal decisionmaker is not the person who harbored an unlawful motive to terminate the employee." (emphasis omitted)). *But see Hull v. Cuyahoga Valley Joint Vocational Sch. Dist. Bd. of Ed.*, 926 F.2d 505, 515 (6th Cir. 1991) ("Plaintiff's argument that [the person who recommended his termination] exercises final authority, because the Board allegedly 'rubber-stamps' his recommendations is contrary to *P[r]aprotnik*'s explicit warning not to look beyond where 'applicable law purports' to vest power." (quoting *City of St. Louis v. Praprotnik*, 485 U.S. 112, 126 (1988) (plurality opinion))).

To date, our Circuit has neither accepted nor rejected the cat's paw approach. Since the matter has not been briefed to us, we deem it advisable to remand the question of the District's possible liability to the district court for its decision in the first instance.

## CONCLUSION

Because Nagle has made a *prima facie* showing that retaliation in violation of the First Amendment caused her to be denied tenure; because Appellees' rebuttal is subject to credibility questions that cannot be resolved as a matter of law; and because Fried and Castar are not, at this

stage of the proceedings, entitled to qualified immunity, we VACATE the district court's grant of summary judgment and REMAND for further proceedings in accordance with this opinion.