Christopher BURNS, Plaintiff,

v.

**DEPARTMENT OF PUBLIC SAFETY,** Steven Fields, Christopher Guari, John Turner, and Frank Griffin, Defendants.

Civ. No. 3:10CV02053(AWT).

United States District Court, D. Connecticut.

Sept. 27, 2013.

Todd D. Steigman, William G. Madsen, Madsen, Prestley & Parenteau, LLC, Hartford, CT, for Plaintiff.

Antoria D. Howard, Attorney General's Office, Hartford, CT, for Defendant.

### RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

ALVIN W. THOMPSON, District Judge.

Christopher Burns ("Burns") has asserted claims against the Connecticut Depart-

ment of Public Safety ("DPS"),[1] Steven Fields ("Fields"), Christopher Guari ("Guari"), John Turner ("Turner"), and Frank Griffin ("Griffin") for violations of Conn. Gen.Stat. § 31–51q (Count One); Conn. Gen.Stat. § 46a–60(a)(11) (Count Two); and the Connecticut Fair Employment Practices Act, Conn. Gen.Stat. § 46a–51 *et seq.* ("CFEPA") (Count Three). He has also asserted a claim, pursuant to 42 U.S.C. § 1983, against defendants Fields, Guari, Turner, and Griffin for violation of his First Amendment Rights (Count Four). The defendants have moved for summary judgment on all claims. For the reasons set forth below, the defendants' motion for summary judgment is being denied.

## I. FACTUAL BACKGROUND

Burns is employed by DPS as a detective. He has been employed by DPS since 2001, and has been assigned to the Eastern District Major Crime Unit ("EDMC") since 2006. In June 2006, Burns was assigned to EDMC Troop C, which is located in Tolland, Connecticut, where Burns resides. From December 2006 to January 2008, Troop C lacked a sergeant to supervise the detectives, although Troop C detectives could contact sergeants in other troops for emergencies.

At times relevant to the complaint, Fields, Guari, Turner, and Griffin were also employed by DPS. Fields was employed as a lieutenant colonel prior to his retirement; Guari was employed as a sergeant at Troop C; Turner was employed as a sergeant with DPS's van unit; and Griffin was employed as a major at the Eastern District Headquarters.

In the summer of 2008, DPS requested DNA samples from some employees. In November 2008, David Rice, a lieutenant at DPS, issued a memorandum indicating that, at that time, DPS was continuing its efforts to collect DNA samples from members of Major Crime Units. DPS has no written policies concerning the collection, storage, retention, and/or testing of DNA submitted by DPS employees.

The Connecticut State Police Union issued a memorandum to its members, dated January 15, 2009 regarding DNA collection. The memorandum stated that DPS "has begun asking members to submit to a DNA sample" and that the Union's position was that its members "not volunteer to provide a DNA sample to the agency." (Memorandum from Steven Rief, President, Connecticut State Police Union, to All Union Members (Jan. 15, 2009), attached as Defts.' Ex. 14.) Burns was aware of this memorandum.

Later in January 2009, DPS employees made several statements to Troop C detectives regarding collection of DPS detectives' DNA. On or around January 27, 2009, following a digital photography class, a representative of DPS's Forensic Science Lab gave a presentation to Troop C detectives regarding the collection of DNA samples. At that meeting, Fields made a statement regarding DNA contamination at crime scenes. On January 28, 2009, Guari met with Troop C detectives, and told them he thought that, in the future, assignments to crime scenes would be determined by whether DNA samples had been submitted for contamination elimination purposes.

On January 28, 2009, Burns had several conversations regarding his concerns about the collection of DNA samples by

---

1. The Department of Public Safety has been renamed the Department of Emergency Services and Public Protection (*see* Defts.' Mot. Summ. J. (Doc. No. 53) at 1 n. 1). The court will use "DPS" because that is the name used in the complaint and the briefing on the motion for summary judgment.

DPS. First, Burns spoke with two other DPS detectives—Tanya Morin ("Morin") and Mark Devine ("Devine"). Burns expressed the opinions that, while he understood the reason the agency needed the DNA samples, he felt that a written policy should be in place regarding the collection, storage, disposal, and testing of DNA; that DPS should be working with the union to develop that policy; and that DNA collection would likely eventually be expanded to include first responders at crime scenes. Devine discussed the DNA collection issue with members of Troop K, and Guari learned that he had done so.

Second, Burns contacted Detective Deslandes ("Deslandes"), his union steward. Burns told Deslandes "that there were efforts being made within the Eastern district to collect [their] DNA" and "that [at] the digital photography class the previous day ... Major Fields had stated ... if [detectives] didn't submit [their] DNA, [they] may not be allowed at crime scenes." (Burns Dep., Pl.'s Ex. A, at 79.) Burns also told Deslandes that he opposed DPS's DNA collection efforts "as the Union itself had opposed such collection" in the January 15 memorandum. (Pl.'s Responses and/or Objections to Defts.' Interrogatories and Requests for Production of Documents 7, attached as Ex. P to Burns Dep., Pl.'s Ex. A.)

Third, Burns spoke with Guari regarding the collection of DPS detectives' DNA. Sometime after Burns spoke with Deslandes, Guari called Burns into Guari's office. Guari had learned that Burns had spoken with someone at the union, and Burns confirmed to Guari that Burns had spoken with Deslandes. Guari told Burns that Fields had heard that Guari was saying that people who had not provided DNA would not be allowed at crime scenes. Burns told Guari that he was concerned about DPS collecting DNA samples from detectives. In particular, Burns told Guari that he "was concerned about the lack of a policy" regarding storage of DNA samples and the possibility that "they were going to start collecting more samples after the patrol troopers." (Burns Dep., Pl.'s Ex. A, at 148.) Guari was angry with Burns and ordered Burns to "un-fuck the situation." (L.R. 56(a) Stmts. ¶ 35.) Burns never directly told Fields, Griffin, or Turner about his concerns regarding DNA collection.

The parties dispute why Guari was angry. Burns contends that Guari was angry that Burns had gone to the union about the collection of DNA samples. The defendants contend that Guari was angry because he assumed Burns had told the union that DPS detectives would not be allowed to process crime scenes unless they had submitted a DNA sample. Guari testified that he "was disappointed that what was stated to the union was that no one would be able to process a crime scene unless they submitted to DNA sampling. And that was a false statement." (Guari Dep., Pl.'s Ex. B, at 51.)

Following the conversation with Guari, Burns spoke again to Deslandes. Burns told Deslandes that he had "felt compelled to tell Sergeant Guari that ... [he] had gone to the union," that Guari was angry, and that "using [the] union steward now had adverse consequences for" Burns. (Burns Dep., Pl's Ex. A, at 82.)[2]

Following these conversations, the defendants took steps that Burns contends were in retaliation for his speech regarding the DNA collection. Guari wrote Turner (in Turner's role as an Executive Offi-

---

2. Additionally, in February 2009, Burns also spoke about DPS's DNA collection efforts with detectives Pete Valentin and Ryan Lu-ther. The record does not make clear what, if anything, Burns said to Detectives Valentin and Luther regarding DNA collection.

cer of EDMC) a memorandum, dated February 16, 2009, complaining about Burns. In the memorandum, Guari indicated that he was unable to reach Burns by phone on February 6, 2009 and that Burns did not follow proper procedures in attempting to swap work days on February 13, 2009. Burns contends that Guari's reaction to those two situations was driven by retaliatory animus. In addition to those two situations, the memorandum addressed Burns's demeanor, failure to follow directions from Guari, sub-par performance in investigations in 2008, and filing of late reports.

On or about February 17, 2009, Turner contacted Burns and told Burns to report to the Eastern District Headquarters. Throughout the day, Burns met with Turner, Fields, Griffin, and Guari in various groupings. Prior to and between the meetings with Burns present, Turner, Fields, Griffin, and Guari held discussions regarding Burns. It is not clear based on the present record whether they discussed Burns's opposition to DNA collection at these meetings. At the final meeting with Burns, Fields gave Burns an ultimatum: (a) transfer out of the Major Crime Unit and return to working on the road or (b) stay in the Major Crime Unit and have an Internal Affairs ("IA") investigation initiated against him.

Burns decided to stay in the Major Crime Unit. He was reassigned to Troop D, which is further from his residence than Troop C.

On February 24, 2009, Guari filed an IA complaint against Burns. The complaint, which attached Guari's memo to Turner, was based on allegations of insubordination towards Guari, performance issues, and being unreachable while off-duty.

On April 6, 2009, Burns received an annual Performance Evaluation Report from Guari. The Performance Evaluation Report gave Burns an overall evaluation of "needs improvement." (Guari Dep. Ex. 8.) Burns filed a grievance with respect to the Performance Evaluation Report. Burns won the grievance and Guari changed the overall evaluation to "satisfactory." (Guari Dep. 110, Ex. 8.)

On June 1, 2009, an IA Investigation Report was issued. The IA Investigative Report recommended not sustaining the complaint relating to insubordination. The Report did, however, recommend sustaining the complaint relating to Burns's not being reachable when off-duty, display of demeanor, and failure to perform duties. Burns contends that the IA investigation conclusions, as well as Guari's memorandum to Turner, included material misrepresentations and conclusions not supported by the evidence. On June 8, 2010, a disciplinary hearing was held. Following the hearing, Burns was sent a letter of reprimand as discipline. The letter of reprimand indicates that it was to be placed in Burns's personnel file for 18 months following the completion of the IA investigation, i.e., that it was to be removed by December 9, 2010. Burns contends that, because of the actions taken by the defendants, he has lost out on promotion opportunities.

The defendants contend that they would have taken the same actions with respect to Burns in the absence of his speech regarding collection of DPS detectives' DNA. In addition to the performance issues mentioned above in connection with Guari's memorandum and the IA investigation, they point to two negative Performance Observation Reports ("PORs"), which are not a form of discipline, that Burns received in January 2009 *before* he commented on DPS's DNA collection. On January 13, 2009, Burns signed a POR that rated his work as "unsatisfactory" in relation to the handling of a sexual assault

case in 2007 and 2008. As part of DPS's investigation into Burns's work on that sexual assault case, a DPS detective wrote a memorandum to Griffin, dated December 23, 2008, which concluded that "failures were made" by Burns in his handling of the case, but also that "there was a lack of direct supervision of Burns" at the time and "there may [have been] some extenuating personal circumstances." (Memorandum from Lt. Louis J. Fusaro, Jr. to Capt. Frank Griffin, Dec. 23, 2008, at 2, attached as Defts.' Ex. 6.) The memorandum also indicated that "the shortcomings identified with Detective Burns's actions have been addressed and an 'Unsatisfactory' POR has been issued." (*Id.*) On January 20, 2009, Burns signed another POR that rated his work as "needs improvement" in regards to his timeliness of filing of reports for the period of September through November 2008.

## II. LEGAL STANDARD

A motion for summary judgment may not be granted unless the court determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the moving party as a matter of law. Fed.R.Civ.P. 56(a). *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1223 (2d Cir.1994). When ruling on a motion for summary judgment, the court may not try issues of fact, but must leave those issues to the jury. *See, e.g., Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Donahue v. Windsor Locks Bd. of Fire Comm'rs*, 834 F.2d 54, 58 (2d Cir. 1987). Thus, the trial court's task is "carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined ... to issue-finding; it

does not extend to issue-resolution." *Gallo,* 22 F.3d at 1224.

Summary judgment is inappropriate only if the issue to be resolved is both genuine and related to a material fact. Therefore, the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. An issue is "genuine ... if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505 (internal quotation marks omitted). A material fact is one that would "affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. Only those facts that must be decided in order to resolve a claim or defense will prevent summary judgment from being granted. Immaterial or minor facts will not prevent summary judgment. *See Howard v. Gleason Corp.,* 901 F.2d 1154, 1159 (2d Cir.1990).

When reviewing the evidence on a motion for summary judgment, the court must "assess the record in the light most favorable to the non-movant and ... draw all reasonable inferences in its favor." *Weinstock v. Columbia Univ.,* 224 F.3d 33, 41 (2d Cir.2000) (quoting *Delaware & Hudson Ry. Co. v. Consolidated Rail Corp.,* 902 F.2d 174, 177 (2d Cir.1990)). However, the inferences drawn in favor of the nonmovant must be supported by evidence. "[M]ere speculation and conjecture" is insufficient to defeat a motion for summary judgment. *Stern v. Trustees of Columbia Univ.,* 131 F.3d 305, 315 (2d Cir.1997) (quoting *Western World Ins. Co. v. Stack Oil, Inc.,* 922 F.2d 118, 121 (2d Cir.1990)). Moreover, the "mere existence of a scintilla of evidence in support of the [nonmovant's] position" will be insufficient; there must be evidence on which a jury

could "reasonably find" for the nonmovant. *Anderson,* 477 U.S. at 252, 106 S.Ct. 2505.

## III. DISCUSSION

### A. Count Four: First Amendment Retaliation

In *Jackler v. Byrne,* 658 F.3d 225 (2d Cir.2011), the court explained:

> It is by now well established both that a citizen, upon entering government service, by necessity must accept certain limitations on his or her freedom, and that upon accepting public employment, such employees do not check all of their First Amendment rights at the door. Government employers, like private employers, need a significant degree of control over their employees' words and actions in order that employees not contravene governmental policies or impair the proper performance of governmental functions; when acting as an employer charged with providing such essential services as public safety and education, rather than a sovereign governing its citizens, a governmental entity has greater leeway under the Constitution to control employees speech that threatens to undermine its ability to perform its legitimate functions.

*Id.* at 234 (internal citations and quotation marks omitted).

> At the same time, the [Supreme] Court has recognized that a citizen who works for the government is nonetheless a citizen. The First Amendment limits the ability of a public employer to leverage the employment relationship to restrict, incidentally or intentionally, the liberties employees enjoy in their capacities as private citizens.

*Garcetti v. Ceballos,* 547 U.S. 410, 419, 126 S.Ct. 1951, 164 L.Ed.2d 689 (2006) (internal citations omitted).

### 1. The Plaintiff's Claim

■ "In order to survive a motion for summary judgment on a First Amendment retaliation claim" by a public employee, the "plaintiff must bring forth evidence showing that he has engaged in protected First Amendment activity, he suffered an adverse employment action, and there was a causal connection between the protected activity and the adverse employment action." *Dillon v. Morano,* 497 F.3d 247, 251 (2d Cir.2007). The defendants do not move for summary judgment with respect to the requirement of a causal connection.

#### a. Protected Speech

The defendants argue that they are entitled to summary judgment because Burns's speech was not protected by the First Amendment. Burns has pointed to three instances of speech that he contends are protected by the First Amendment, all of which took place on January 28, 2009: (1) his conversation with detectives Morin and Devine, (2) his conversations with union steward Deslandes, and (3) his conversation with Guari. The record also demonstrates that Burns sent letters regarding collection of DPS detectives' DNA in April 2009 to Connecticut Attorney General Richard Blumenthal, DPS Commissioner John Danaher, Governor M. Jodi Rell, the American Civil Liberties Union of Connecticut, the State Police Union and various committees of the Connecticut State Legislature. However, Burns does not contend that the speech in those letters resulted in the defendants retaliating against him.

■ To determine whether a public employee's speech is protected by the First Amendment, the court must answer two questions: "(1) whether the subject of the employee's speech was a matter of public concern and (2) whether the employee spoke 'as a citizen' rather than sole-

ly as an employee." *Jackler*, 658 F.3d at 235 (citing *Garcetti*, 547 U.S. at 420–22, 126 S.Ct. 1951); *see also Sousa v. Roque*, 578 F.3d 164, 170 (2d Cir.2009). "[B]oth are questions of law, suitable for resolution at the summary judgment stage." *Ricciuti v. Gyzenis*, 832 F.Supp.2d 147, 154 (D.Conn.2011) (citing *Jackler*, 658 F.3d at 235, 237).

### i. Matter of Public Concern

■ The defendants contend that the First Amendment does not protect the speech at issue here because that speech did not address a matter of public concern. "To constitute speech on a matter of public concern, an employee's expression must 'be fairly considered as relating to any matter of political, social, or other concern to the community.' " *Jackler*, 658 F.3d at 236 (quoting *Connick v. Myers*, 461 U.S. 138, 146, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983)); *see also City of San Diego, Cal. v. Roe*, 543 U.S. 77, 83–84, 125 S.Ct. 521, 160 L.Ed.2d 410 (2004) ("public concern is something that is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public at the time of publication"). "Speech that, although touching on a topic of general importance, primarily concerns an issue that is 'personal in nature and generally related to [the speaker's] own situation,' such as his or her assignments, promotion, or salary, does not address matters of public concern." *Jackler*, 658 F.3d at 236 (quoting *Ezekwo v. NYC Health & Hospitals Corp.*, 940 F.2d 775, 781 (2d Cir.1991)). "Whether speech is on a matter of public concern ... is to be answered by the court after examining the 'content, form, and context of a given statement, as revealed by the whole record.' " *Id.* at 235 (quoting *Connick*, 461 U.S. at 148 n. 7, 103 S.Ct. 1684) (internal citation omitted).

■ The defendants contend that Burns's speech regarding DNA collection by DPS did not address a matter of public concern because it only concerned state police detectives. "An employee who complains solely about his own dissatisfaction with the conditions of his own employment is speaking 'upon matters only of personal interest.' " *Sousa*, 578 F.3d at 174 (quoting *Connick*, 461 U.S. at 147, 103 S.Ct. 1684); *Ruotolo v. City of New York*, 514 F.3d 184, 189 (2d Cir.2008) ("The heart of the matter is whether the employee's speech was calculated to redress personal grievances or whether it had a broader public purpose." (internal quotation marks omitted)). For example, in *Connick*, the Supreme Court found that questions on a questionnaire distributed by a prosecutor regarding her office's transfer policy and office morale "reflect[ed] one employee's dissatisfaction with a transfer" and were not a matter of public concern, but that a question on the questionnaire regarding pressure to work on political campaigns was a matter of public concern. 461 U.S. at 148–49, 103 S.Ct. 1684. Similarly, in *Ezekwo*, the Second Circuit found that a series of complaints, letters, and memoranda "were personal in nature and generally related to [the plaintiff's] own situation" within her medical residency program and, as such, "did not address matters of public concern." 940 F.2d at 781.

■ In contrast to the speech by the plaintiffs in *Connick* and *Ezekwo*, Burns's statements concerned not solely his own employment conditions, but employment conditions for a class of employees in his department (i.e., DPS detectives). Additionally, Burns's conversations with Detectives Morin and Devine and with Guari included statements regarding a concern that the scope of people subject to DNA collection by DPS would expand. Moreover, the fact that the union had issued a

memorandum to its members regarding DNA collection further demonstrates that DNA collection by DPS was of concern to a broader set of people than Burns alone and that Burns's statements were not solely about Burns's own dissatisfaction with his own employment conditions.[3]

█ While the defendants argue that the plaintiff's comments were personally motivated to address his own situation, "a speaker's motive is not dispositive in determining whether his or her speech addresses a matter of public concern." *Sousa*, 578 F.3d at 173. Burns's speech cannot be categorized as personal, rather than public, merely because it may have been motivated by a personal desire to not give a DNA sample. In any event, the current record does not demonstrate that Burns's speech was motivated by a personal desire to avoid providing a DNA sample.

█ Furthermore, "[t]he fact that a statement was made to the employer in private is not determinative of whether its subject was a matter of public concern." *Jackler*, 658 F.3d at 235 (citing *Connick*, 461 U.S. at 148 & n. 8, 103 S.Ct. 1684). Therefore, Burns's speech cannot be categorized as personal merely because it was made to only DPS employees and a union representative.

In light of the content, form, and context of Burns's January 2009 statements regarding collection of detectives' DNA by DPS, the court finds that these statements did address a matter of public concern.

### ii. Pursuant to Employment Duties

█ The defendants further contend that the First Amendment does not apply to Burns's statements on DNA collection because those statements were made by Burns acting as a government employee, rather than a private citizen. "[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti*, 547 U.S. at 421, 126 S.Ct. 1951. Speech made pursuant to duties is speech that "owes its existence to a public employee's professional responsibilities." *Id.* "The objective inquiry into whether a public employee spoke 'pursuant to' his or her official duties is 'a practical one.'" *Weintraub v. Bd. of Educ. of City Sch. Dist. of City of New York*, 593 F.3d 196, 202 (2d Cir.2010). "Speech can be 'pursuant to' a public employee's official job duties even though it is not required by, or included in, the em-

---

3. Burns additionally contends that the speech at issue addressed a matter of public concern because it addressed unlawful conduct by DPS. "[C]oncerns raised to the government about the lawfulness of public officials' actions ... implicat[e] a matter of public interest." *Hoyt v. Andreucci*, 433 F.3d 320, 330 (2d Cir.2006) (concluding that speech advising a county legislature "that one of its employees ... was disciplining corrections officers in an unlawful manner" was, "on its face, ... related to a matter of public concern"); *see also Garcetti*, 547 U.S. at 425, 126 S.Ct. 1951 ("Exposing governmental inefficiency and misconduct is a matter of considerable significance."); *Jackler*, 658 F.3d at 236 ("Exposure of official misconduct, especially within the police department, is generally of great consequence to the public." (quoting *Branton v. City of Dallas*, 272 F.3d 730, 740 (5th Cir.2001))). Here, however, the record does not reflect that Burns expressed concerns that DPS requests for DNA samples from DPS detectives were unlawful or otherwise a form of misconduct in the speech that he now contends is protected by the First Amendment. (*See* Pls.' Opp. to Mot. Sum. J. (Doc. No. 56) at 3–5 (listing instances of Burns's opposition to the collection of DNA).) Moreover, there is no indication in the record that Burns even perceived the requests for DNA samples to be illegal at the time he made the statements at issue.

ployee's job description, or in response to a request by the employer." *Id.* at 203.

■ The Second Circuit has considered whether speech was "part-and-parcel" of a public employee's execution of his official duties. In *Weintraub,* the court concluded that a public school teacher filing a grievance with his union regarding an assistant principal's failure to discipline a student "was 'pursuant to' [the teacher's] official duties because it was 'part-and-parcel of his concerns' about his ability to 'properly execute his duties' ... as a public school teacher—namely, to maintain classroom discipline, which is an indispensable prerequisite to effective teaching and classroom learning." *Id.* at 203.

The defendants contend that Burns's speech was within his job duties and responsibilities "because [he] spoke as a government employee rather than as a private citizen. The conduct he complained of only affected him and other state police detectives and not public citizens." (Defts.' Mem. Supp. Mot. Summ. J. (Doc. No. 53) at 11; *see also id.* at 7.)[4] However, the defendants fail to identify any official duty of Burns pursuant to which he was acting when speaking about DPS's DNA collection efforts. Moreover, unlike it *Weintraub,* Burns's speech did not clearly concern his ability to properly execute his official duties. Thus, the defendants have not demonstrated that Burns's statements regarding DNA collection were "part-and-parcel" of his official duties.

Therefore, because Burns's statements were not pursuant to his official duties, the statements fall within the protections of the First Amendment.

### b. Adverse Employment Action

■ The defendants argue that "[m]any of the plaintiff's allegations are insufficient to support his retaliation claim in that they were not adverse employment actions." (Defts.' Mem. Supp. Mot. Summ. J. (Doc. No. 53) at 13.) To the extent that the defendants move for summary judgment with respect to specific instances of alleged adverse employment actions, the court notes that:

In the context of a First Amendment retaliation claim, [the Second Circuit has] held that only retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action. In this context, adverse employment actions include discharge, refusal to hire, refusal to promote, demotion, reduction in pay, and reprimand. This list of retaliatory conduct is certainly not exhaustive, however, and lesser actions may also be considered adverse employment actions. Adverse employment actions may include negative evaluation letters, express accusations of lying, assignment of lunchroom duty, reduction of class preparation periods, failure to process teacher's insurance forms, transfer from library to classroom teaching as an alleged demotion, and assignment to classroom on fifth floor which aggravated teacher's physical disabilities.

*Zelnik v. Fashion Inst. of Tech.,* 464 F.3d 217, 225–26 (2d Cir.2006) (internal citations, quotation marks and brackets omitted). Moreover, "a combination of seemingly minor incidents [may] form the basis of a constitutional retaliation claim once they reach a critical mass." *Phillips v. Bowen,* 278 F.3d 103, 109 (2d Cir.2002).

**4.** *See generally Ricciuti,* 832 F.Supp.2d at 155–58 (discussing the factors to consider in determining whether speech was made pursuant to a public employee's official duties). However, the defendants rely solely on this factor.

"[W]hether an undesirable employment action qualifies as being 'adverse' is a heavily fact-specific, contextual determination." *Hoyt v. Andreucci,* 433 F.3d 320, 328 (2d Cir.2006). Burns has produced evidence that the defendants subjected him to heightened scrutiny, a transfer, an IA investigation, a formal reprimand, and a poor performance evaluation report. The evidence of these actions, viewed in combination, is sufficient to create a genuine issue of material fact as to whether Burns suffered an adverse employment action.

## 2. The *Mt. Healthy* Defense

■ The defendants state that Burns "cannot prevail on his First Amendment retaliation claim because there is more than sufficient evidence for a reasonable jury to find that the defendant would have taken the same actions with regard to the plaintiff regardless of his complaint." (Defts.' Mem. Supp. Mot. Summ. J. (Doc. No. 53) at 12.) The court interprets their memorandum as arguing that a reasonable jury would have to find that the defendants would have taken the same action regardless of Burns's speech regarding DNA collection. *See Nagle v. Marron,* 663 F.3d 100, 112 (2d Cir.2011) ("[A]t this stage of the proceedings, [the defendants] are entitled to summary judgment if they can show that a reasonable jury would have to find by a preponderance of the evidence that [the defendants] would have dismissed [the plaintiff] even had they not learned of her Virginia speech.").

> Even if the plaintiff makes out a prima facie retaliation claim, a government defendant may still receive summary judgment if it establishes its entitlement to a relevant defense. One such defense, ar-

ticulated in *Mt. Healthy [City Sch. Dist. Bd. of Educ. v. Doyle],* 429 U.S. [274,] 287, 97 S.Ct. 568, 50 L.Ed.2d 471 [ (1977) ] ..., provides that "even if there is evidence that the adverse employment action was motivated in part by protected speech, the government can avoid liability if it can show that it would have taken the same adverse action in the absence of the protected speech." *Heil v. Santoro,* 147 F.3d 103, 109 (2d Cir.1998).... "[A]lthough the language in *Mt. Healthy* refers to the plaintiff's conduct, the [Supreme] Court's analysis, properly understood, attempts to weigh the impact of the defendant's impermissible reason on the defendant's decision to act," such that a defendant can "avoid liability by showing that it would have taken the same action in the absence of the impermissible reason." *Greenwich Citizens Comm.[, Inc. v. Cntys. of Warren and Washington Indus. Dev. Agency],* 77 F.3d [26,] 32 [ (1996) ]. The burden is on the government to make out the defense. *Heil,* 147 F.3d at 110.

*Anemone v. Metro. Transp. Auth.,* 629 F.3d 97, 114–15 (2d Cir.2011).

In arguing that they would have taken the same actions regardless of Burns's speech on DNA collection, the defendants point to issues with Burns's past performance. In particular, they point to the January 2009 PORs that rated Burns's performance as "unsatisfactory" with respect to the sexual assault investigation and as "need[ing] improvement" with respect to the timeliness of completing reports, as well as Burns's attempt to swap work days on February 13, 2009.[5] The defendants further argue that the IA "investigation

---

5. While the defendants use Burns's attempt to swap work days in support of their argument that Burns had performance issues predating his complaints about DNA collection, the attempt to swap work days in February 2009

post-dated Burns's speech on DNA collection in January 2009. The attempt to swap work days did, however, pre-date Guari's memorandum complaining about Burns.

done by an independent investigator," which recommended sustaining several complaints against Burns, "substantiated plaintiff's performance issues which took place before February 2009." (Defts.' Mem. Supp. Mot. Summ. J. (Doc. No. 53) at 16.)

The plaintiff asserts, however, that he did not have a significant history of performance problems, which is supported by Turner's testimony that prior to Guari's complaint Turner had never received any other complaints regarding Burns. Additionally, Burns points out that Guari recognized that all Troop C detectives had overdue reports, but only complained to Turner about Burns's overdue reports. Moreover, after his transfer to Troop C, Burns received a positive review from Griffin and his new supervising sergeant, and has not had any negative issues with his new sergeant that have come to Fields's attention.

The defendants also argue that there is no genuine issue of material fact that the defendants would have taken the same action against Burns because Fields had "sole responsibility for initiating the Internal Affairs investigation" and "there is no evidence that [he] was aware of plaintiff's objections" regarding DPS's efforts to collect detectives' DNA. (Defts.' Mem. Supp. Mot. Summ. J. (Doc. No. 53) at 16.) However, the IA investigation was based on the IA complaint filed by Guari, who was aware of Burns's objections to DNA collection, and there are genuine issues of material fact as to whether Guari would have filed the IA complaint in the absence of Burns's speech regarding DNA collection. Therefore, even if Fields was unaware of Burns's speech on DNA collection, the IA investigation and resulting letter of reprimand were not the result of a process initiated independently of any such retaliation by Guari.

Based on the current record, a reasonable jury could fail to conclude that the defendants would have taken the same action toward Burns regardless of his speech.

### 3. Personal Involvement for § 1983 claim

The defendants argue that Fields, Guari, Turner, and Griffin are entitled to summary judgment on the § 1983 First Amendment claim because Burns cannot establish the necessary personal involvement by them.

> A supervisory official is liable for constitutional violations if he or she (1) directly participated in the violation; (2) failed to remedy the violation after learning of it through a report or appeal; (3) created a custom or policy fostering the violation or allowed the custom or policy to continue after learning of it; or (4) was grossly negligent in supervising subordinates who caused the violation.

*Sealey v. Giltner*, 116 F.3d 47, 51 (2d Cir.1997) (citing *Williams v. Smith*, 781 F.2d 319, 323–24 (2d Cir.1986)).

The defendants make three assertions in support of this argument, each of which is disputed. First, as to defendant Griffin, the defendants argue that he had "limited involvement in this case" and his involvement was purely supervisory. However, according to DPS's responses to Burns's complaint to the Connecticut Commission on Human Rights and Opportunities, Griffin was directly involved in the decision to transfer Burns. (Pl.'s Ex. I at 11.)

Second, as to defendants Griffin, Turner and Fields, the defendants point to the fact that Burns never told them about his objections to DNA collection or his complaint to the union. However, that fact does not mean they did not learn of Burns's objections and conversation with his union through other channels, e.g., from Guari.

Moreover, the defendants point to no evidence that these three defendants were unaware of Burns's opposition to DNA collection or discussion with the union at the time of the alleged adverse employment actions.

Third, the defendants argue that Burns "has failed to prove that any of the individual defendants had involvement in the reprimand he received after the internal affairs investigation." However, there is evidence that each of the individual defendants participated in the decision to institute the IA investigation, so the ramifications of that investigation are not independent from their conduct. Thus, for each of the defendants, there remains a genuine issue of material fact as to whether they directly participated in the violation.

### 4. Qualified Immunity

 The defendants argue that they are entitled to summary judgment pursuant to the doctrine of qualified immunity. Specifically, they argue that "even if [Burns]'s objections to Sgt. Guari and his union and eventually other entities outside of the agency were possibly protected by the First Amendment, such protection was not clearly established." (Defts.' Mem. Supp. Mot. Summ. J. (Doc. No. 53) at 23.)

> [A] decision dismissing a claim based on qualified immunity at the summary judgment stage may only be granted when a court finds that an official has met his or her burden demonstrating that no rational jury could conclude "(1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct."

*Coollick v. Hughes,* 699 F.3d 211, 219 (2d Cir.2012) (quoting *Ashcroft v. al-Kidd,* —— U.S. ——, 131 S.Ct. 2074, 2080, 179 L.Ed.2d 1149 (2011)).

As to the first prong, for the reasons set forth above, the defendants have not met their burden of demonstrating that no rational jury could conclude defendants Fields, Guari, Turner, and Griffin violated Burns's First Amendment rights.

 As to the second prong, "a '[g]overnment official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Coollick,* 699 F.3d at 220 (quoting *al-Kidd,* 131 S.Ct. at 2083). Thus, the relevant question is whether the right to engage in speech like Burns's was clearly established in early 2009. "The relevant inquiry is not whether the defendants should have known that there was a federal right, in the abstract, to 'freedom of speech,' but whether the defendants should have known that the specific actions complained of violated the plaintiff's freedom of speech." *Lewis v. Cowen,* 165 F.3d 154, 166–67 (2d Cir.1999).

The defendants contend that it was objectively reasonable for the defendants to believe that Burns's objections to DNA collection by DPS "did not address matters of public concern" and that Burns "was not speaking as a private citizen but as a state police detective, pursuant to his official job duties" and that, as a consequence of either of those beliefs, to believe that Burns's speech was not protected by the First Amendment. (Defts.' Reply Mem. Supp. Summ. J. (Doc. No. 60) at 10.) However, the defendants have not explained why such a belief would be reasonable apart from reiterating their arguments as to why the defendants did not violate Burns's rights.

In early 2009, it was clear that with respect to the public concern requirement, "[t]he heart of the matter is whether the

employee's speech was 'calculated to redress personal grievances or whether it had a broader public purpose.' " *Ruotolo*, 514 F.3d at 189 (quoting *Lewis*, 165 F.3d at 163–64). Additionally, even though *Weintraub* was not decided until 2010, the "pursuant to" requirement was clear in early 2009. *See generally Garcetti*, 547 U.S. at 420–26, 126 S.Ct. 1951.

\* \* \*

Therefore, the defendants' motion for summary judgment as to Count Four is being denied.

### B. Count One: Conn. Gen.Stat. § 31–51q

██ The defendants move for summary judgment on Count One, which asserts a claim for a violation of Conn. Gen. Stat. § 31–51q. To assert a valid claim under Conn. Gen.Stat. § 31–51q: [6]

> [a] plaintiff must show: (1) that [ ]he engaged in protected speech, (2) that [ ]he was disciplined or fired because of that speech, and (3) that such speech did not substantially or materially interfere with [his] bona fide job performance or

with [his] working relationship with her employer.

*Downing v. W. Haven Bd. of Ed.*, 162 F.Supp.2d 19, 33 (D.Conn.2001) (citing *Lowe v. AmeriGas, Inc.*, 52 F.Supp.2d 349, 359 (D.Conn.1999)). The defendants argue that Burns's speech was not protected by § 31–51q, relying on their arguments regarding the First Amendment claim and citing Connecticut case law for the propositions that § 31–51q, like the First Amendment, "applies only to expressions regarding public concerns that are motivated by an employee's desire to speak out as a citizen," *Cotto v. United Tech. Corp.*, 251 Conn. 1, 17, 738 A.2d 623 (1999), and follows *Garcetti* by not protecting speech made pursuant to one's official duties, *see Perez–Dickson v. City of Bridgeport*, 304 Conn. 483, 43 A.3d 69 (2012).[7] For the reasons set forth with respect to the First Amendment claim, the motion for summary judgment is being denied as to Count One.

### C. Counts Two and Three: Violation of CFEPA

Burns has asserted two claims under CFEPA, Conn. Gen.Stat. § 46a–51 *et seq.*:

---

**6.** "Any employer, including the state and any instrumentality or political subdivision thereof, who subjects any employee to discipline or discharge on account of the exercise by such employee of rights guaranteed by the first amendment to the United States Constitution or section 3, 4 or 14 of article first of the Constitution of the state, provided such activity does not substantially or materially interfere with the employee's bona fide job performance or the working relationship between the employee and the employer, shall be liable to such employee for damages caused by such discipline or discharge, including punitive damages, and for reasonable attorney's fees as part of the costs of any such action for damages...." Conn. Gen.Stat. § 31–51q.

**7.** Because the court concludes that Burns's speech was not made pursuant to his official duties, *see* Section III.A.1.a.ii, *supra*, it does

not reach the issue of whether *Garcetti* applies to claims under § 31–51q. *Compare Ozols v. Town of Madison*, No. 3:11CV1324 (SRU), 2012 WL 3595130 (D.Conn. Aug. 20, 2012) (in *Perez–Dickson*, the Connecticut Supreme Court "confirmed that *Garcetti* applies to section 31–51q claims that are based on violations of the First Amendment.... The Court declined to decide whether *Garcetti* applies to section 31–51q claims that are based on the state constitution. I believe that, were the Connecticut Supreme Court to answer the above question, it would hold that *Garcetti* does not apply to claims based on the state constitution.") *with Lenox v. Town of Branford*, No. 3:08CV01448 (DJS), 2012 WL 6102470 (D.Conn. Dec. 7, 2012) (applying *Garcetti* to a § 31–51q claim where the plaintiff did not argue that his rights were broader under the Connecticut constitution than the federal Constitution).

(1) in Count Two, Burns asserts that the defendants violated Conn. Gen.Stat. § 46a–60(a)(11) by requesting DNA samples from DPS employees, and (2) in Count Three, Burns asserts that the defendants retaliated against him in violation of CFEPA for voicing opposition to the collection of DPS detectives' DNA.

### 1. Count Two: Violation of Conn. Gen.Stat. § 46a–60(a)(11)

■■■ The defendants argue that they are entitled to summary judgment on Count Two because Burns failed to state a cause of action with respect to that claim. Section 46a–60(a)(11) provides, in pertinent part, that:

> It shall be a discriminatory practice in violation of this section ... [f]or an employer, by the employer or the employer's agent ...: (A) To request or require genetic information from an employee, person seeking employment or member.... For the purpose of this subdivision, "genetic information" means the information about genes, gene products or inherited characteristics that may derive from an individual or a family member.

The defendants argue that § 46a–60(a)(11) is comparable to the federal Genetic Information Nondiscrimination Act of 2008, Pub.L. No. 110–233, 122 Stat. 881 (codified in various sections of 29 U.S.C. and 42 U.S.C.) ("GINA"). GINA is similar to § 46a–60(a)(11)(A) and provides that "[i]t shall be an unlawful employment practice for an employer to request, require, or purchase genetic information with respect to an employee or a family member of the employee." 42 U.S.C. § 2000ff–1(b). However, GINA provides an exception for

> where the employer conducts DNA analysis for law enforcement purposes as a forensic laboratory or for purposes of human remains identification, and requests or requires genetic information of

such employer's employees, but only to the extent that such genetic information is used for analysis of DNA identification markers for quality control to detect sample contamination.

42 U.S.C. § 2000ff–1(b)(6). Section 46a–60(a)(11) does not include any analogous exception for law enforcement purposes. Therefore, the defendants' citation to GINA is unpersuasive.

The defendants also argue, in their reply brief, that they (1) did not violate § 46a–60(a)(11), (2) did not intend to violate § 46a–60(a)(11), and (3) are not liable to Burns for violation of § 46a–60(a)(11) because the request for DNA did not adversely affect him.

As to the first argument, the plaintiff has produced sufficient evidence that could support a finding by a reasonable jury that the defendants violated § 46a–60(a)(11).

As to the second and third arguments, they are raised by the defendants for the first time in their reply brief. "It goes without saying that a reply brief should respond only to issues and arguments raised in the opposition brief." *U.S. ex rel. Smith v. Yale–New Haven Hosp., Inc.,* 411 F.Supp.2d 64, 74 (D.Conn.2005) (citing D. Conn. L. Civ. R. 7(d) (A reply brief "must be strictly confined to a discussion of matters raised by the responsive brief ..."); *Knipe v. Skinner,* 999 F.2d 708, 711 (2d Cir.1993) ("Arguments may not be made for the first time in a reply brief.").)

■■■ However, even if the arguments were properly before the court, they would fail. With regard to the second argument, the defendants have not identified any authority for the proposition that lack of intent to violate § 46a–60(a)(11) would entitle them to summary judgment on Count Two. The text of § 46a–60(a)(11) does not contain an intent element, and the Connecticut Supreme Court has held that

"[s]pecific intent is not an element requisite to a violation of the CFEP[A][8]." *Evening Sentinel v. Nat'l Org. for Women,* 168 Conn. 26, 33, 357 A.2d 498 (1975). As to the third argument, the defendants contend that the plaintiff has not demonstrated that he was adversely affected by the claimed violation of § 46a–60(a)(11) because he never applied for the promotional opportunities he alleges he "lost out" on. (Defts.' Reply Mem. Supp. Summ. J. (Doc. No. 60) at 8.) However, even if his failure to specifically apply for a promotion precluded the plaintiff from arguing that failure to receive a promotion was adverse, the plaintiff has produced sufficient evidence of other adverse actions. *See* Section III.A.1.b, *supra.*

Thus, with respect to each of these arguments, the defendants, as the party moving for summary judgment, have not met their initial burden of demonstrating that material facts as to which there is no genuine issue warrant judgment for them as a matter of law. Therefore, the defendants' motion for summary judgment as to Count Two is being denied.

### 2. Count Three: Retaliation under CFEPA

In analyzing CFEPA retaliation claims, Connecticut courts "look[ ] for guidance to federal case law interpreting Title VII of the Civil Rights Act of 1964...." *Brittell v. Dep't of Corr.,* 247 Conn. 148, 164, 717 A.2d 1254 (1998); *see also Levy v. Comm'n of Human Rights and Opportunities,* 236 Conn. 96, 103, 671 A.2d 349 (Conn.1996) (reviewing federal precedent concerning employment discrimination for guidance in enforcing § 46a–60). Thus, CFEPA retaliation claims are evaluated under a three-step burden-shifting analysis.

First, the plaintiff must establish a prima facie case. That is, an employee must show (1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action.

The burden of proof that must be met to permit a[ ] plaintiff to survive a summary judgment motion at the prima facie stage has been characterized as minimal and de minimis. In determining whether this initial burden is satisfied in a[ ] retaliation claim, the court's role in evaluating a summary judgment request is to determine only whether proffered admissible evidence would be sufficient to permit a rational finder of fact to infer a retaliatory motive.

If a plaintiff sustains the initial burden, a presumption of retaliation arises. In turn, under the second step of the burden-shifting analysis, the onus falls on the employer to articulate a legitimate, non-retaliatory reason for the adverse employment action. Finally, as for the third step, once an employer offers such proof, the presumption of retaliation dissipates and the employee must show that retaliation was a substantial reason for the adverse employment action.

*Jute v. Hamilton Sundstrand Corp.,* 420 F.3d 166, 173 (2d Cir.2005) (setting forth the analytical framework for Title VII retaliation claims) (internal citations and quotations marks omitted); *see also McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–05, 93 S.Ct. 1817, 36 L.Ed.2d

---

8. At the time *Evening Sentinel* was decided, the Connecticut Fair Employment Practices Act was codified at Conn. Gen.Stat. § 31–126.

The Act has since been transferred to § 46a–60.

668 (1973); *Hicks v. Baines,* 593 F.3d 159, 164–65 (2d Cir.2010).

> To defeat summary judgment within [this] framework the plaintiff is not required to show that the employer's proffered reasons were false or played no role in the employment decision, but only that they were not the only reasons and that the prohibited factor was at least one of the motivating factors.

*Back v. Hastings On Hudson Union Free School Dist.,* 365 F.3d 107, 123 (2d Cir. 2004) (internal quotation marks and brackets omitted); *see also Quinn v. Green Tree Corp.,* 159 F.3d 759, 769 (2d Cir.1998) (at the motion for summary judgment stage, for the third step, "if the defendant meets its burden, [the] plaintiff must adduce evidence sufficient to raise a fact issue as to whether the employer's reason was merely a pretext for retaliation." (internal quotation marks and brackets omitted)) (recognized as abrogated in part on other grounds by *Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002) in *General v. Center for Disability Rights,* 481 Fed.Appx. 678, 680 (2d Cir.2012)).

The defendants argue that Burns "has failed to prove that the defendants' conduct was somehow retaliatory." (Defts.' Mem. Supp. Mot. Summ. J. 19.) Construing the evidence in the light most favorable to Burns, he has set forth evidence sufficient to create a genuine issue of material fact as to whether the reasons offered by DPS are pretextual. *See Quinn,* 159 F.3d at 770 (relying on "a strong temporal correlation" to "conclude that there is a sufficient basis for a trier of fact to doubt the persuasiveness of the company's proffered evidence and ultimately to find that the reasons offered by the Company for [the plaintiff]'s dismissal were pretextual").

## IV. CONCLUSION

For the reasons set forth above, the Defendants' Motion for Summary Judgment (Doc. No. 53) is hereby DENIED.

It is so ordered.