**Daniel R. SCHWARTZ, Plaintiff,**

v.

**Gregory J. ANDERSON, Cecile L. Baccanale, Michael J. Eagen, Donna B. Munroe, Peter J. Nicholls and Richard A. Simoniello, Defendants.**

**Case No. 3:10–CV–0644 (RNC).**

United States District Court,
D. Connecticut.

Signed March 29, 2015.

John R. Williams, Rose Longo–McLean, John R. Williams & Associates, LLC, New Haven, CT, for Plaintiff.

Antoria D. Howard, Carolyn Ennis, Josephine S. Graff, Attorney General's Office, Hartford, CT, for Defendants.

*RULING AND ORDER*

ROBERT N. CHATIGNY, District Judge.

Plaintiff Daniel R. Schwartz brings this action pursuant to 42 U.S.C. § 1983 against six employees of the University of Connecticut ("UConn") alleging that his employment at UConn was terminated because he engaged in protected speech. The defendants have moved for summary judgment principally on the grounds that the termination did not violate the First Amendment and they are entitled to qualified immunity. I conclude that even if

plaintiff's speech could be viewed as meriting protection under the First Amendment in one or more instances, a reasonable official in the defendants' position could think otherwise and thus they are entitled to qualified immunity as a matter of law.[1]

## I. *Background*

The following account draws from the largely undisputed facts, with any contested points resolved in favor of the plaintiff. The defendants are or were UConn employees connected with the university's animal research program. At the relevant times, Gregory Anderson served as Vice Provost for Research and Graduate Education and Dean of the Graduate School; Cecile Baccanale directed UConn's Office of Animal Research Services ("OARS") (and supervised the plaintiff in his work between July 2007 and September 2008); Michael Eagen acted as a University Labor and Employment Specialist; Donna Munroe was UConn's Vice President for Human Resources and Payroll; Peter Nicholls was the Provost and Executive Vice President for Academic Affairs; and Richard Simoniello was the University's Program Director for Animal Care Services and Compliance. ECF No. 39–2 at 1–2.

In 1995, plaintiff began working part-time as a veterinarian at a UConn animal research facility. The following year he accepted a full-time position as an Attending Laboratory Animal Veterinarian. *Id.* at 2. As an Attending Veterinarian, his duties included diagnosing and treating sick and injured research animals, working with federal and state regulatory agencies to ensure compliance with law, developing programs to train staff, and advising his superiors and the University about any failures to meet regulatory standards. ECF No. 42, Ex. 4. In 1998, he became the first Director of the newly created OARS, a UConn office that performs scientific research using animals. ECF No. 39, Ex. G at 20.

The parties agree that after 1998, plaintiff and his superiors were often at odds. He was removed as Director of OARS in 2000. *Id.* In June 2001, the OARS Interim Director reviewed plaintiff's performance and found that although he was skilled in animal medicine, he was failing to discharge his duties in certain respects. ECF No. 39, Ex. C:1. The Interim Director indicated in a memorandum that plaintiff failed to meet regularly with other members of staff, did not consistently aid fellow workers in carrying out their responsibilities, and cultivated a "vindictive" and "unprofessional" attitude. *Id.* In 2002, Vice Provost Ian Hart wrote a letter to the plaintiff citing many of the same concerns and criticizing plaintiff's "apparent unwillingness to accept what is intended as constructive criticism." ECF No. 39, Ex. C:3. In the letter, Hart cautioned that "a second year of poor evaluations will cause us to seriously review your overall competency for the position of Attending Veterinarian." *Id.*

After several years of relative calm, the relationship between plaintiff and his employer began to deteriorate again. In late 2005 or early 2006, OARS created a new

---

1. Defendants also rely on the applicable three-year statute of limitations, *see Matthews v. Conn. Dep't of Pub. Safety*, No. 3:10 Civ. 325(MRK), 2010 WL 3984645, at *5 (D.Conn. Oct. 8, 2010), arguing that because this suit was filed in April 2010, only speech that occurred after April 2007 is actionable. ECF No. 39–1, at 5. For reasons that will be discussed in the text, none of the instances of speech that occurred prior to April 2007 provides a basis for recovery. Accordingly, this decision rests on an evaluation of the merits of the claims and the defense of qualified immunity rather than the statute of limitations.

job description for plaintiff that decreased some of his responsibilities and seems to have eliminated his duty to monitor OARS's compliance with federal and state guidelines. ECF No. 42, Ex. 5. The next month, defendant Anderson reprimanded plaintiff by letter after he refused to provide a health certificate for laboratory mice that UConn was shipping overseas. The letter warned plaintiff that "further similar incidents may result in disciplinary action up to and including dismissal for cause." ECF No. 39, Ex. C:7. A similar communication followed in May, this time because plaintiff had refused to assist a colleague who requested his aid. ECF No. 39, Ex. C:5. Following these incidents, UConn denied plaintiff a salary adjustment in August 2006, but its decision was ultimately reversed after a union grievance. ECF No. 42–1 at 4.

In December 2007, Anderson chastised plaintiff again, this time for denying another veterinarian's request to euthanize a rabbit, making an "untrue and disparaging remark about a colleague" in an e-mail, and rebuffing superiors' requests to work on weekends and holidays. ECF No. 39, Ex. C:6. The following July, defendant Baccanale e-mailed defendant Eagen to report that plaintiff had refused to tend to an injured mouse, which threatened to compromise an important research project. ECF No. 39, Ex. M. (Plaintiff disputes the accuracy of this report.) UConn placed plaintiff on paid administrative leave on July 29, 2008, and terminated his employment that September. ECF No. 42–1, at 4. Defendants state that plaintiff was fired because he had a long record of substandard performance and disagreeable behavior.

Plaintiff contends that UConn terminated his employment because he made a habit of notifying superiors and outside entities about serious problems within OARS. He cites a number of e-mails and phone calls he initiated to various individuals, some affiliated with the University and some not, concerning such matters as the proper treatment of laboratory animals and the protocol for accessing controlled substances. Plaintiff does not dispute that his superiors reprimanded him on a number of occasions between 1996 and 2008, but he asserts that they did so chiefly to retaliate against him for whistleblowing. He identifies four complaints that occasioned retaliation by his superiors.

## A. *Drug Control Violations*

Veterinarians at OARS used a number of controlled substances to treat research animals. As a matter of protocol, both the drugs and a binder used to log their use were required to be kept under lock and key. In June 2005, plaintiff became concerned that OARS employees were neglecting to comply with this requirement.[2] He therefore placed all of OARS's controlled substances and the log book in a cabinet secured with a bicycle lock. ECF No. 39, Ex. J–4(1). Plaintiff hid the key to the lock and disclosed its location to no one but OARS Director Doug Stone (his boss) and one other employee. When Stone twice left the cabinet unlocked and on another occasion permitted an employee who was not listed on the drug registration to access the controlled substances, plaintiff told Stone he was no longer allowed to access the cabinet and hid the key in a new location. *Id.* Stone demanded to know where it was, and plaintiff e-mailed the Drug Control Division of the Department of Consumer Protection ("DCP") to ask for guidance. *Id.*

**2.** At that time plaintiff was one of the veterinarians listed on OARS's controlled substance registration, which was filed with the State of Connecticut.

Plaintiff ultimately capitulated and gave Stone a key to the bicycle lock. But Stone soon left the records unsecured again. Plaintiff e-mailed a supervisor, who forwarded the e-mail to defendant Nicholls. Nicholls's reply indicated that plaintiff had acted properly in contacting DCP and suggested that he should alert the University Police if he suspected criminality. *Id.*

## B. *Drug Registration Violations*

OARS's state registration placed restrictions on the facility's use of controlled substances. OARS was not permitted to distribute drugs to other laboratories, and only employees listed on its registration were allowed to access controlled substances. ECF No. 39, Ex. J–4(2). In February 2007, plaintiff noticed that the log book indicated that OARS had distributed drugs to another laboratory the previous May. He responded to the violation with an e-mail to Eagen and defendant Munroe, neither of whom initiated an investigation. *Id.*

On July 20, 2007, plaintiff noticed another violation. An Animal Care Manager named Teresa Samuels had placed her initials in the controlled substances log even though she was not listed on the current registration. (At that time, the registration was under the name of defendant Simoniello.) *Id.* Plaintiff called a DCP agent, Gerald DeStefano, to find out whether Samuels was authorized to access drugs. No investigation followed. Plaintiff alleges, however, that his superiors learned about his contact with DCP: the agenda for a September 2007 meeting between Anderson and Nicholls lists as an item "Consumer Protection Agency—Senior Drug Control Agent meeting Thursday Whistle Blowers Policy—Schwartz." *Id.*

A similar incident occurred in May 2008. After seeing Samuels's initials on the drug log, plaintiff alerted DeStefano. Some time later, DeStefano told plaintiff that the DCP deals with such incidents by contacting the licensee, informing the licensee of the complaint, and "remedy[ing] the complaint in the least intrusive manner possible."

## C. *Rabbit Euthanasia*

On July 11, 2007, Baccanale sent plaintiff an e-mail asking him to euthanize three rabbits using a drug called Euthasol. Instead of performing the procedure, plaintiff prepared a response arguing that carbon dioxide gas is an acceptable agent for euthanizing rabbits. ECF No. 39, Ex. K. In his e-mail, plaintiff discussed statements from various research protocols that call for the use of carbon dioxide to euthanize pregnant rabbits unable to deliver their young. (Neonates evidently resist the effects of carbon dioxide better than adults, so an adult female may be euthanized with carbon dioxide without harming her young. The researcher can then collect the neonates.) Plaintiff pointed out that none of the cited research protocols explicitly forbade the use of carbon dioxide as a euthanasic on non-pregnant rabbits. *Id.* Plaintiff did not make clear in the e-mail precisely why he preferred to use carbon dioxide instead of Euthasol; he simply asserted that euthanasia by carbon dioxide was permissible. Plaintiff sent the response to Baccanale two hours after she had asked him to euthanize the rabbits. He directed a copy to a representative of the Institutional Animal Care and Use Committee ("IACUC"), a University body responsible for reviewing OARS policies concerning the humane care and treatment of animals. *Id.* Plaintiff attached to his e-mail a copy of the Euthasol label (a two-page document summarizing indications, directions, and warnings concerning the drug). *Id.*

Following this incident, Anderson accused plaintiff of insubordination for failing to promptly euthanize the rabbits as Baccanale had directed. ECF No. 39, Ex. J–4(4). Plaintiff argued then and argues now that "as a board-certified laboratory animal veterinarian" he was responsible for "read[ing] the research protocol and document[ing] his concerns before assisting in the planned experimental procedure." *Id.* One University professor copied on plaintiff's response understood him to be raising "an animal welfare question" but responded by reminding him of the need to avoid delaying scheduled procedures.

### D. *Complaints to the Office of Audit, Compliance and Ethics ("OACE")*

On May 7, 2008, plaintiff sent an e-mail to the University's OACE, a body charged with ethical oversight of OARS. The e-mail ran six single-spaced pages and comprised a litany of complaints about OARS and plaintiff's supervisors as follows:

—Plaintiff complained about OARS Director Doug Stone. ECF No. 42, Ex. 8, at 2. He charged that Stone had regularly left controlled substances unsecured and had unjustly accused plaintiff of insubordination. Moreover, plaintiff stated, Stone had received credit for helping UConn achieve its first citation-free USDA inspection in years, when in truth the University had accomplished that goal before Stone started working there. *Id.*

—Plaintiff argued that he had not been at fault in the various incidents that marred his employment record. He argued, for instance, that he had been justified in refusing to certify a shipment of mice for transport overseas. Plaintiff wrote, "I think it is wrong to require I write health certificates when the 'University' no longer pays for my licenses." *Id.* at 3.

—Plaintiff recounted the controversy surrounding the proper way to euthanize rabbits and alleged that he had been accused of insubordination after the incident. He pointed out that, apparently because of such occurrences, he had not been given work commensurate with his abilities. *Id.* Instead, his supervisors had targeted him and blocked his advancement within OARS.

—Plaintiff argued that his supervisors were unfit for their positions. Baccanale, for instance, was hired by "a rigged search committee" and was "not a board-certified veterinarian." *Id.* Simoniello was "adept at self-promotion and discrediting others," but plaintiff knew "of no other director of an animal care program with as little credentials." *Id.* at 6. Plaintiff asserted that his clinical bona fides surpassed those of Stone or Baccanale and that Simoniello was his superior even though "several other OARS staff members including [plaintiff] [were] certified at a higher level." *Id.*

—Plaintiff objected to a change in OARS's policies regarding outside consulting. Before Stone, Anderson, and Baccanale had begun working at UConn, plaintiff had done consulting work for other animal-care facilities in Connecticut on University time. *Id.* at 4. But in 2006, he had been told to restrict that work to personal or vacation time. *Id.*

—Finally, in a set of numbered paragraphs labeled "Additional Concerns," plaintiff identified various lesser issues. Baccanale, for instance, often failed to include sufficient information in her e-mails and sometimes omitted to respond to messages. *Id.* at 5. In 2008, she dismissed three technicians without cause. And when Baccanale was hiring veterinary technicians, she never sought plaintiff's opinions. *Id.*

Plaintiff closed his May 2007 e-mail by offering to transfer to a new position "for a fair salary" if he could work under "a board-certified Director who honestly present [sic] his or her degree(s) and credentials and who has respect for and treats staff and others fairly." *Id.* at 7.

Attached to the May 2007 e-mail was another e-mail that plaintiff had sent to Anderson in December 2005. In the December 2005 e-mail, plaintiff had requested reinstatement of his job title and responsibilities as Attending Veterinarian with membership on the Institutional Animal Care and Use Committee (IACUC). *Id.* at 8. The e-mail argued, in essence, that plaintiff had been demoted because of USDA violations within OARS that occurred when he was Attending Veterinarian, but for which he was "in no way accountable." *Id.* Under his watch, the e-mail stated, OARS had been "well on the way to better compliance" before Doug Stone arrived. Yet Stone had received credit for reforming OARS policies to conform with federal regulations. *Id.* The e-mail stated that after losing his job title, plaintiff had found it difficult to obtain leave and spent too many days on call.

Plaintiff sent another e-mail on June 5, this one to OACE member Kimberly Fearney. Plaintiff thanked Fearney for meeting with him about his May 7 e-mail[3] and stated that he was "dealing with a pattern of behavior by my supervisors including their fabrication of accusations, false investigations, nasty letters, and inaccurate reports." ECF No. 42, Ex. 6 at 1. He suggested that Fearney "look into" a number of reports and reviews that, he said, documented his mistreatment.

Defendant Nicholls, who was copied on the June 5 e-mail, forwarded it to defendants Eagen, Munroe, and Anderson. He added, "I think you all need to be aware that this individual is engaged in these sorts of discussions with Kim Fearney." *Id.*

Plaintiff e-mailed Fearney one final time on June 21. He told Fearney that he had been called into work because the mice in two cages had become dehydrated and tried to eat each other. He indicated that the cages' Autowater systems failed under certain circumstances and that OARS probably had too few technicians to properly monitor the mice. ECF No. 42, Ex. 9 at 1.

Plaintiff was placed on administrative leave a month after this last e-mail message and his employment was terminated in September.[4] He then filed this suit under 42 U.S.C. § 1983, alleging that the defendants violated his First Amendment rights by retaliating against him because of his protected speech.[5]

---

**3.** The record does not disclose when this meeting occurred or what was discussed.

**4.** Shortly thereafter, he filed an administrative complaint before the Connecticut Commission on Human Rights and Opportunities. He won a damages award on the ground that his superiors had retaliated against him by failing to return his personal belongings after his termination. *See Eagen v. Comm'n on Human Rights & Opportunities,* 135 Conn. App. 563, 42 A.3d 478 (2012). Neither party argues that the administrative proceeding bears at all on this one.

**5.** Plaintiff emphasizes that the defendants foresaw this action when they terminated his employment. In a July 28, 2008 e-mail from Eagen to Munroe, Eagen stated that plaintiff's dismissal "might trigger a retaliation claim in state or federal court (whistleblower or free speech presumably) that would focus on UCONN's animal care program and Dan's alleged vigilance in speaking out about flaws, etc." ECF No. 56, Ex. 1 at 15.

## II. *Legal Standards*

On a motion for summary judgment, the Court's role is to identify triable issues, not to try them. Summary judgment is proper only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(a). A "material" fact is one that might influence the case's outcome under governing substantive law, and a "genuine" dispute is one in which the evidence would permit a reasonable jury to find for the party opposing the motion. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A motion for summary judgment tests the nonmoving party's evidence rather than its bare allegations or denials, but the Court resolves all ambiguities and draws all reasonable inferences in the nonmovant's favor. *Gallo v. Prudential Residential Servs., Ltd. P'ship,* 22 F.3d 1219, 1223 (2d Cir.1994).

To prove his First Amendment retaliation claim under § 1983, plaintiff must show "(1) that the speech at issue was protected, (2) that he suffered an adverse employment action, and (3) that there was a causal connection between the protected speech and the adverse employment action." *Nagle v. Marron,* 663 F.3d 100, 105 (2d Cir.2011). Because this case involves speech by a government employee, the speech at issue was not protected unless plaintiff spoke as a citizen on a matter of public concern. *See Garcetti v. Ceballos,* 547 U.S. 410, 418, 126 S.Ct. 1951, 164 L.Ed.2d 689 (2006). Even when both requirements are satisfied, government officials may restrict employee speech if it has the potential to disrupt operations. *Pickering v. Bd. of Ed. of Township High Sch. Dist. 205, Will Cnty.,* 391 U.S. 563, 572–73, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968).

Whether a government employee is speaking as a citizen or as part of his job depends primarily on the nature of his duties. The "controlling factor" is whether the employee is speaking "pursuant to duties." *Garcetti,* 547 U.S. at 421, 126 S.Ct. 1951. But this requires analysis beyond mere consideration of the employee's written job description; "the proper inquiry is a practical one." *Id.* at 424, 126 S.Ct. 1951. Speech that occurs at work or that is directed to a superior might be less likely to be protected, but this factor is not dispositive. Neither is it conclusive that the speech concerns the subject matter of employment. *Id.* at 420, 126 S.Ct. 1951. If in all the circumstances the employee speaks because that is "what he ... [is] employed to do," the government as employer may properly control what he says. *Id.* at 421, 126 S.Ct. 1951. If not, he is speaking as a citizen and the government's power to curb his expression is strictly limited.

"Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Connick,* 461 U.S. at 147–48, 103 S.Ct. 1684. Speech is more likely to concern the public if "addressed to a public audience," *United States v. Nat'l Treasury Emps. Union,* 513 U.S. 454, 466, 115 S.Ct. 1003, 130 L.Ed.2d 964 (1995), but speech made in private can qualify too. *See Rankin v. McPherson,* 483 U.S. 378, 381, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987). If the employee's motivation for speaking is to inform the public, a court is more likely to hold that it is on a matter of public concern. *See Ezekwo v. NYC Health & Hosps. Corp.,* 940 F.2d 775, 781 (2d Cir.1991). Even a purely personal agenda, however, is not conclusive the other way. *Huth v. Haslun,* 598 F.3d 70, 74 (2d Cir.2010). Government

employees can provide valuable information of concern to the public regarding the operation of the institutions for which they work, *see Pickering*, 391 U.S. at 569–70, 88 S.Ct. 1731, but not every employee complaint is protected by the First Amendment. *Brtalik v. S. Huntington Union Free Sch. Dist.*, No. 10 Civ. 0010, 2010 WL 3958430, at *7 (E.D.N.Y.2010).

 As in many First Amendment retaliation cases brought by government employees, the defendants rely on the affirmative defense of qualified immunity. Under § 1983, a government officer is immune from suit in his personal capacity except for conduct that violates clearly established law. An official violates clearly established law only when, "at the time of the challenged conduct, 'the contours of a right are sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 131 S.Ct. 2074, 2083, 179 L.Ed.2d 1149 (2011). The doctrine of qualified immunity attempts to give officials confidence to act firmly in gray areas by penalizing only those who cross clear lines. In employee-speech cases, where constitutional boundaries are often "blurry," qualified immunity is frequently a difficult barrier for plaintiffs. *See Stickley v. Sutherly*, 416 Fed.Appx. 268, 272 (4th Cir.2011).

Plaintiff contends that qualified immunity is categorically unavailable in this case because he alleges "retaliatory animus." "If the defendants' motivation is found to be retaliatory in nature," plaintiff asserts, "qualified immunity is inappropriate." ECF No. 56 at 11. It is not clear what the plaintiff means by "retaliatory animus" or "retaliatory motive." It appears, though, that he uses these terms to mean something like, "with the intent to punish the plaintiff because of the content of his speech."

In arguing that evidence of retaliation bars the qualified immunity defense, plaintiff relies on *Locurto v. Safir*, 264 F.3d 154 (2d Cir.2001). In *Locurto*, a New York City police officer helped build a racist float for a Labor Day parade and rode on the float through Queens. *Locurto*, 264 F.3d at 159–60. He was fired and brought suit under § 1983 on the theory that the City had retaliated against him for exercising his First Amendment freedoms. The case therefore presented a *Pickering* question. The City conceded that the officer had spoken on a matter of public concern. (There was no doubt he had spoken as a citizen and not as an employee.) *Id.* at 168. But it argued that it could justify the officer's firing under *Pickering's* second prong because the speech so threatened to disrupt the workplace that discharge was permissible even though the plaintiff had spoken as a citizen on a matter of public concern. *Id.* In response, the plaintiff argued that the City had not in fact fired him because it feared his speech would disrupt governmental operations; its real objection was to the content of his speech. The City took the position that, for two reasons, its actual motivation was irrelevant. First, what mattered was whether a reasonable official could have determined that the plaintiff's speech was likely to disrupt the workplace, not whether any officials actually did make that determination. Second, it argued, questions of subjective intent are *per se* irrelevant to the qualified immunity inquiry. For this proposition it cited *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).

The Court of Appeals rejected both arguments. In so doing it wrote, "[W]here subjective intent is actually an element of the plaintiff's claim as defined by clearly established law, it can never be objectively reasonable for a government official to act

with the intent that is prohibited by law." *Locurto*, 264 F.3d at 169. The question raised by plaintiff's argument in the present case is what this language means. Plaintiff says it precludes qualified immunity whenever the government fires an employee over the content of speech. For three reasons, plaintiff's reading of the Court's language in *Locurto* is not correct.

First, plaintiff's argument wrenches the Court's language from context. As just discussed, the Court was responding to two specific arguments advanced by the City. The first concerned *Pickering's* second prong, which balances the government's interest in maintaining an efficient workplace against an employee's interest in speaking freely. In relation to this argument, the Court recognized that the government may fire an employee whose speech threatens to disrupt operations, but only if it actually believes the speech will be disruptive.[6] The second argument the Court addressed was the City's reliance on *Harlow* for the proposition that questions of subjective intent are irrelevant at the qualified immunity stage. *Id.* at 169. The Court pointed out that under *Crawford–El v. Britton*, 523 U.S. 574, 118 S.Ct. 1584, 140 L.Ed.2d 759 (1998), qualified immunity analysis must address issues of subjective intent when the underlying constitutional tort contains an intent element. *Crawford–El*, 523 U.S. at 593, 118 S.Ct. 1584. *Locurto*, then, does not support the novel rule plaintiff suggests here.

Second, plaintiff's argument is contrary to *Crawford–El*, which is the Supreme Court's latest statement on the intersection of qualified immunity and intent-based constitutional torts. In *Crawford–El*, the Court was asked to alter the qualified immunity inquiry in cases involving substan-

tive claims with subjective elements. The argument was that questions of intent too often prevent courts from disposing of such claims on summary judgment. *Id.* The Court declined to fashion a new rule but took care to explain that even intent-based claims are often susceptible to the qualified immunity defense. When the law concerning the *objective* elements of a motive-based claim is not clearly established, wrote the majority, summary judgment on the ground of qualified immunity is proper:

> Even when the general rule has long been clearly established (for instance, the First Amendment bars retaliation for protected speech), the substantive legal doctrine on which the plaintiff relies may facilitate summary judgment in two different ways. First, there may be doubt as to the illegality of the defendant's particular conduct (for instance, whether a plaintiff's speech was on a matter of public concern).

*Id.* Plaintiff's argument runs headlong into this principle, which also appears prominently in *Locurto*. *See* 264 F.3d at 168 ("The Supreme Court has suggested that a First Amendment retaliation claim may prove susceptible to summary judgment in appropriate cases based on the absence of elements from a plaintiff's threshold showing, such as whether the speech was on a matter of public concern....").

Finally, in light of the substantive law of government employee speech, plaintiff's argument goes too far. It is odd to talk about "retaliatory motive" or "unlawful animus" in cases in which it is not clear that the speech was made in the employee's capacity as a citizen on a matter of public concern. Every firing based on something an employee has said is "retaliatory" in the

---

**6.** This is another way of saying that when the government does not in fact think that protected employee speech will disrupt operations, it has no interest in disallowing the speech and thus cannot prevail in the *Pickering* balancing test.

sense that it results from the employer's disapproval of the statement. *Pickering* stands for the principle that when the government acts as an employer instead of as a regulator, it should have some latitude to fire its employees because of the things they say. Put another way, unless an employee speaks as a citizen on a matter of public concern, a "retaliatory motive" is not necessarily a bad thing, at least as far as the Speech Clause is concerned. It would therefore be strange if such a motive, without more, affected the constitutional calculus.

In sum, plaintiff's evidence of "retaliatory animus" does not affect the qualified immunity inquiry with respect to the objective elements of the alleged constitutional tort. As in any qualified immunity case, the question will turn on whether the defendants' actions were plainly illegal under clearly established law.

## III. *Discussion*

Plaintiff has identified four instances of allegedly protected speech. Defendants argue that none of the speech was protected because in each instance plaintiff spoke as an employee, not as a citizen, and because his speech did not touch on matters of public concern. They also argue that even if a jury could find that plaintiff spoke as a citizen on a matter of public concern, they are nonetheless entitled to qualified immunity as a matter of law because it would not have been clear to a reasonable official that the speech was protected.

## A. *Drug Control Violations*

 During the summer of 2005, plaintiff e-mailed the Connecticut DCP to ask for advice about how to respond to Stone's failure to secure the controlled substances cabinet. He also e-mailed a supervisor about the same issue. This speech was not protected by the First Amendment because plaintiff was speaking pursuant to his duties as an employee. At that time, plaintiff was an Attending Veterinarian and a member of the IACUC. According to his formal job description, he was responsible for "advis[ing] OARS, administration, IACUC, faculty, and researchers on all issues of noncompliance with USDA, PHS, and AAALAC guidelines." ECF No. 42, Ex. 4. He was also listed as the registrant on OARS's drug registration. The parties agree that as the registrant, he was charged by law with reporting violations of protocol to DCP. *See* Conn. Gen. Stat. § 21a–262; ECF No. 50 at 4–5. This evidence strongly suggests that when he called the DCP and e-mailed his supervisors, he was discharging his duties as an employee rather than acting as a concerned citizen.

Plaintiff does not dispute this conclusion. Indeed, his argument that not all of his speech was made in his capacity as an employee relies heavily on the change in his job description that occurred in late 2005 or early 2006. Concerning that shift in his responsibilities, plaintiff asserts:

> Defendants Anderson and Munroe adopted a job description to ensure that addressing violations and filing complaints would not be part of the plaintiff's job responsibilities.... Upon Dr. Stone's departure ... Anderson and Munroe expended great effort and much expense in hiring outside consulting Attending Veterinarians to ensure that addressing animal welfare violations and that [sic] filing complaints were not pursuant to the plaintiff's job responsibilities....

ECF No. 50 at 4; *see also* ECF No. 42 at 9 (admitting that "[t]he job description of Clinical Veterinarian, which the defendants put in place for the plaintiff as of February 6, 2006 ... specifically omitted [plaintiff's

previous] regulatory oversight responsibilities."). Plaintiff concedes that he was the registrant listed on OARS's registration until January 2006 and relies on the change to argue that he was not responsible for reporting violations that occurred in 2006 or later. ECF No. 39, Ex. J–4(2). Both changes—the reformulation of his job description and the end of his tenure as registrant—occurred some four months after his last complaint about drug control violations.

In light of plaintiff's formal job description and his concessions concerning the changes to his responsibilities after he complained to DCP and to his supervisor, it must be concluded that in this instance he spoke as an employee rather than as a citizen. His complaints were therefore not protected under *Garcetti*.

 Moreover, the defendants are entitled to qualified immunity concerning this speech because it would not have been clear to a reasonable official in their position that plaintiff spoke on a matter of public concern. Plaintiff has not even attempted to identify a case sufficiently similar to this one to put the defendants on notice that plaintiff's speech was protected and their action illegal. Instead, he simply asserts that "compliance for controlled drug substances" is an issue of "heightened public concern." ECF No. 56 at 4.

The issue, however, is not whether the broad topic of controlled-substance regulation is a matter of public concern. Of course it is. What matters is whether, in all the circumstances, the "content, form, and context" of these particular complaints suggests that they merit protection. *See*

*Connick*, 461 U.S. at 147, 103 S.Ct. 1684.[7] A review of the case law shows that even if the speech was protected (which I need not decide), it would not have been clear to a reasonable official in the defendants' position.

First, an official assessing the content of these complaints could have justifiably concluded that they were not protected. Plaintiff basically called attention to three occasions on which employees failed to secure a cabinet containing controlled substances and a log book. Though Second Circuit precedent establishes that speech exposing "pervasive or systemic misconduct by a public agency or public officials" relates to a matter of public concern, plaintiff's complaints did not address such extensive malfeasance. *Saulpaugh v. Monroe Comm. Hosp.*, 4 F.3d 134, 143 (2d Cir.1993) (quoting *Yatvin v. Madison Metro. Sch. Dist.*, 840 F.2d 412, 420 (7th Cir. 1988)). *Nagle* illustrates the point. In that case, the plaintiff alleged that she had been fired because she reported that her boss had forged her signature on a document. *Nagle*, 663 F.3d at 107–08. Forgery, as the court noted, is a crime, and in some general sense the public should and does care about criminal behavior by public servants. But the court held that absent some indication that the plaintiff was trying to address widespread misbehavior or egregiously poor judgment by an official, the speech was not protected. *Id.* A reasonable official who had read these cases and assessed plaintiff's complaints could reasonably have concluded that they touched on isolated instances of carelessness by his colleagues instead of "pervasive or systemic misconduct" and were

---

7. In *Ezekwo*, for instance, the plaintiff complained about discrimination based on race and gender. That general topic undoubtedly concerns the public, but the Second Circuit concluded that her particular speech did not. *Ezekwo*, 940 F.2d at 778, 781; *see also Connick*, 461 U.S. at 148 n. 8, 103 S.Ct. 1684 ("The dissent's analysis of whether discussions of office morale and discipline could be matters of public concern is beside the point—it does not answer the question whether *this* questionnaire is such speech.").

therefore not on a matter of public concern.

Neither does the form or the context of plaintiff's complaints suggest that they are protected. Though speech "does not have to be public in order to be protected as a matter of public concern, the choice of forum for the speech is relevant to the inquiry." *Rambaldi v. City of Mount Vernon*, No. 7:01 Civ. 03648(GAY), 2003 WL 23744272, at *8 (S.D.N.Y. Mar. 31, 2003) (holding that an employee's speech was on a matter of public concern in part because the speech was published in a local newspaper). That plaintiff directed his speech only to his superiors and to an enforcement agent (as was required of him by law) suggests that it was not protected.

Qualified immunity ensures that public officials will be personally liable only for crossing obvious lines. Nothing in the case law establishes that plaintiff's complaints about drug control violations were obviously protected speech. Rather, cases like *Saulpaugh, Nagle,* and *Rambaldi* suggest the opposite conclusion. The defendants therefore enjoy the protection of qualified immunity.

### B. *Drug Registration Violations*

In 2007 and 2008, plaintiff notified his superiors and the DCP that OARS had distributed drugs to another laboratory and that unregistered employees were accessing controlled substances. Apparently in response, Anderson and Nicholls scheduled a meeting with the agenda item, "Consumer Protection Agency–Senior Drug Control Agent meeting Thursday Whistle Blowers Policy–Schwartz." ECF No. 39, Ex. J–4(2). Disputes of material fact preclude the determination that plaintiff made these complaints as an employee, but the defendants are entitled to qualified immunity because it is not clear that the complaints were on a matter of public concern.

The question whether plaintiff spoke as an employee on these occasions cannot be resolved as a matter of law. Plaintiff supports the argument that he spoke as a citizen by pointing to his shift in responsibilities in late 2005 or early 2006, after which his written job description no longer made mention of compliance or reporting duties. He also points out that OARS's drug registration did not include him as a registrant after January 2006, and argues that this terminated his obligation to report drug violations to DCP. Defendants respond with an affidavit from Baccanale stating that every OARS employee, including plaintiff, was responsible for reporting compliance issues. ECF No. 39, Ex. B at 2. This dispute concerning plaintiff's duties at the pertinent time raises a triable issue of fact. A reasonable jury could infer from the language of plaintiff's 2006 job description that his employers meant to eliminate his compliance responsibilities entirely, and it could decide not to credit Baccanale's affidavit. A jury also could reasonably find the other way.

However, the defendants are entitled to qualified immunity regarding these complaints. · Plaintiff argues that his speech touched on matters of public concern because it involved the illegal use and distribution of drugs. But his argument ignores the proper inquiries: whether the content, form and context of the speech show it was protected, and whether the case law established this sufficiently clearly to overcome the defense of qualified immunity. Plaintiff's argument fails because in this instance his speech concerned infrequent breaches of administrative protocol instead of "pervasive or systemic misconduct." *Saulpaugh,* 4 F.3d at 143 (2d Cir.1993) (quoting *Yatvin,* 840 F.2d at 420 (7th Cir. 1988)). Indeed, in this instance the DCP's

response to his grievances demonstrates that the matters plaintiff reported were reasonably viewed as relatively minor. The agent who handled the plaintiff's complaints told him that the proper remedy was to contact the offending official, tell him about the allegation, and "remedy the complaint in the least intrusive manner possible." ECF No. 39, Ex. J–4(2). This apparent lack of concern bolsters the conclusion that a reasonable official in the defendants' position could conclude that plaintiff's complaints did not merit protection.

In resisting this conclusion plaintiff relies heavily on the Anderson–Nicholls meeting agenda. He argues that the defendants must have known that his speech was protected because they "literally identified the plaintiff as a whistleblower." ECF No. 56 at 3. The first problem with this argument is that its factual premise is false. The meeting agenda does not "literally identif[y] the plaintiff as a whistleblower." It simply indicates that the defendants discussed plaintiff in connection with UConn's "Whistle Blowers Policy." Only a foolish official would discipline an employee who had complained to a state agency without regard for institutional policy or governing law.

Moreover, as has been discussed, the defendants' subjective understandings are not relevant to the question whether plaintiff's right to speak was clearly established. Plaintiff's argument in this respect must rest on case law clearly establishing that he spoke on a matter of public concern, not discovery materials showing that Anderson viewed him as a whistleblower. Plaintiff cites no such case law. Defendants are therefore entitled to qualified immunity on this part of the case.

## C. *Rabbit Euthanasia*

In July 2007, plaintiff sent an e-mail to Baccanale and members of the IACUC arguing that carbon dioxide gas can be used to euthanize non-pregnant rabbits. Plaintiff did not indicate in the e-mail why he preferred carbon dioxide to Euthasol, the agent Baccanale had directed him to use. One IACUC member initially thought plaintiff was unable to access Euthasol but later suggested that the question concerned "animal welfare." ECF No. 39, Ex. K. Defendants argue that the e-mail was not protected speech because plaintiff sent it in his capacity as an employee and that they are entitled to qualified immunity because it was not clear that plaintiff was addressing a matter of public concern. I agree.

In the summer of 2007, plaintiff's duties as a Clinical Veterinarian included "provid[ing] veterinary care ... and administer[ing] drugs as needed." ECF No. 42, Ex. 5. His opinion about which drugs could appropriately be used to induce death in rabbits was "part-and-parcel of his concerns about his ability to properly execute [those] duties." *Weintraub v. Bd. of Educ. of the City of New York*, 593 F.3d 196, 203 (2010) (internal quotation marks omitted). This conclusion is reinforced by the e-mail's scientific bent: it cites a number of research protocols, discusses the active principles in Euthasol, and reproduces the Euthasol label. The communication is part of a technical discussion among veterinarians about how best to perform their jobs. Moreover, plaintiff's own admissions show that he believed he was acting pursuant to duty when he e-mailed the IACUC. In a response to interrogatories from the defendants, plaintiff wrote of the rabbit euthanasia controversy:

> [I]n July 2007, Schwartz was again targeted for termination for 'insubordination' in regards to a rabbit euthanasia incident. ... On the insubordination charge, Anderson repeatedly asked why

Schwartz did not immediately do as Baccanale emailed on July 11, 2007 from her adjacent office and Schwartz repeatedly responded that as a board-certified laboratory animal veterinarian Schwartz must read the research protocols and document his concerns before assisting in a planned experimental procedure.

ECF No. 39, Ex. J–4(4). In other words, when plaintiff "document[ed] his concerns" in his e-mail, he thought he was simply doing his job. The speech therefore "owe[d] its existence to [his] professional responsibilities" and provides no basis for a First Amendment claim. *Garcetti*, 547 U.S. at 421, 126 S.Ct. 1951; *see also Anemone v. Metro. Transp. Auth.*, 629 F.3d 97, 116 (2d Cir.2011) (holding that an employee's speech was not protected in part because the employee "testified that as Director of Security at the MTA, he ... viewed cooperating with [District Attorneys' offices] as among his duties").

▄▄▄ In any event, the defendants are entitled to qualified immunity concerning this speech because a reasonable official could have concluded that plaintiff's e-mail was not on a matter of public concern. Plaintiff argues otherwise on the ground that his message was about "animal welfare." I have no doubt that questions about the care and treatment of animals used for research concern the public. *See, e.g., Rambaldi*, 2003 WL 23744272, at *8 (holding that an allegation of animal abuse published in a newspaper was speech on a matter of public concern). But this case concerns the plaintiff's e-mail, not animal welfare as a general topic. And a reasonable official assessing the content, form and context of plaintiff's message could have concluded that it did not touch on a matter of public concern.

As discussed, the content of the e-mail chiefly concerns technical questions about veterinary care, not issues relating to the humane treatment of animals. Indeed, the message nowhere suggests any concern about the rabbits' well-being. It devotes itself entirely to the interpretation of various research protocols and the argument that carbon dioxide is a scientifically viable agent for euthanizing a rabbit. People who received the message initially thought that plaintiff had sent it because he was unable to access Euthasol; only later did one suggest that his concern was "animal welfare." [8] ECF No. 39, Ex. K.

The form and the context of the e-mail also indicate that it did not relate to matters of public concern. Plaintiff directed his speech to supervisors within the University, not to the public at large. He "did not seek to inform the public," *Connick*, 461 U.S. at 148, 103 S.Ct. 1684, but to discuss a matter of veterinary protocol with his professional colleagues. Moreover, the context in which he sent the e-mail weighs against the conclusion that it concerned the public. In his response to an interrogatory, plaintiff indicates that he e-mailed the IACUC because Baccanale had recently determined to use Euthasol to euthanize rabbits and had tried "to force [him] to change procedures without first notifying the animal care committee." ECF No. 39, Ex. J–4(4). Viewed in light of this response, plaintiff's e-mail is reasonably viewed as a light rebuke of Baccanale's choice of Euthasol based on considerations of science and protocol. There is no indication that it was part of a larger effort to address animal-welfare concerns within OARS.

I need not decide whether the tangential connection between this e-mail and the

---

8. The record does not indicate why this employee came to think that the plaintiff was concerned about the rabbits' welfare. If Schwartz engaged in other speech after his e-mail that made this purpose clear, that speech is not in evidence.

humane care of animals brings the speech within the ambit of the First Amendment. Qualified immunity defeats recovery in any case. Plaintiff has not cited a single case indicating with any clarity that his speech was protected. To be sure, some *Pickering* cases involve speech about the care and treatment of animals, but none is remotely similar to this one. *Rambaldi* is probably the closest case from within the Second Circuit. In *Rambaldi*, the plaintiff complained about an animal shelter's "animal abuse and needless euthanasia" to "City officials, the Mayor and to the press." *Rambaldi*, 2003 WL 23744272, at *8. Her complaints were "published in numerous local newspaper articles." *Id.* The court held that this speech was on a matter of public concern.

Rambaldi is a long way from this case. There, the speech's content (direct allegations of "animal abuse"), form (complaints to politicians and to newspapers) and context (a long campaign directed toward obtaining relief for the animals) all weighed heavily for protection. Here, as discussed, all three factors militate in the opposite direction to such an extent that Rambaldi could not have indicated to a reasonable official that plaintiff was speaking on a matter of public concern.[9]

## D. *OACE Complaints*

In May and June of 2008, plaintiff sent three e-mails to OACE. The first two are similar in content and can be considered together. The third, which concerns problems with OARS's laboratory cages, must be analyzed separately.

### 1. *The May 7 and June 5, 2008 E-mails*

The content of these e-mails is described in detail in Part I.D., *supra*, and need not be repeated here. Basically, the e-mails explained why plaintiff had not been at fault in the drug registration and rabbit euthanasia incidents, argued that his superiors were incompetent, and asserted that his title and perquisites were not commensurate with his abilities. In a December 2005 e-mail that accompanied the May 7 e-mail, plaintiff had asked to be reinstated as an Attending Veterinarian. In the May 7 e-mail, he asked to be transferred so that he could work under new supervisors.

I again find no case law that would have put the defendants on notice that plaintiff was speaking as a citizen in these e-mails instead of as an employee. The thrust of the precedent from within the Second Circuit is the other way. In the *Brtalik* case, for instance, the plaintiff wrote a number of letters to administrators charging his colleagues with misconduct. *Brtalik*, 2010 WL 3958430, at *1. He alleged that a colleague had lost a key to a projection booth in a school, creating a risk of injury to students who might enter the booth as well as a possibility of theft. Moreover, he charged, his superiors often asked him to make copies of copyrighted videotapes, an unlawful act he declined to perform. *Id.*

The court held that the plaintiff had made his complaints as an employee, not as a citizen. The statements, the court wrote, all concerned "[p]laintiff's work environment, and his working relationship

---

**9.** Even if *Rambaldi* could reasonably be read to clearly indicate that plaintiff spoke on a matter of public concern, it would not be enough for the plaintiff. *Rambaldi* is not a Second Circuit case—indeed it is not even a District of Connecticut case—and is therefore by itself insufficient to defeat qualified immu-

nity. *See Ashcroft v. al-Kidd*, 563 U.S. 731, 131 S.Ct. 2074, 2084, 179 L.Ed.2d 1149 (2011) (noting that only "controlling authority," or a "robust consensus of cases of persuasive authority," suffices to "clearly establish" the law).

with [a defendant] and other District employees." *Id.* at *6. It reasoned that reporting on his colleagues' failures to properly discharge their responsibilities fell within the plaintiff's duties as a government employee.

Here, as in *Brtalik,* plaintiff's complaints chiefly concern his "work environment" and his "working relationship" with the defendants. *See id.* Plaintiff thought it was "wrong to require that [he] write health certificates when the 'University' no longer pa[id] for his licenses." ECF No. 42, Ex. 8 at 3. Baccanale was hired by a "rigged search committee." *Id.* Stone, Anderson, and Baccanale "continued a practice of not promptly returning [plaintiff's] annual consulting requests." *Id.* at 4. Baccanale "often [did] not reply to submitted drafts of assigned reports." *Id.* at 5. These are the complaints of a dissatisfied employee, not of a concerned citizen.

Plaintiff points out that in these e-mails, he went outside the chain of command and over the heads of his bosses. He is correct to suggest that this tends to support the conclusion that he did not speak as an employee. But plaintiff's decision to contact OACE instead of speaking to an immediate superior is by no means dispositive. *See, e.g., Anemone,* 629 F.3d at 116 ("[Plaintiff] argues that once he went 'outside the chain of command' ... his subsequent discussions ... were protected.... [I]t would be incongruous to interpret *Garcetti,* a case concerned with allowing the government to control its employees within their jobs, as giving broader protections to disobedient employees who decide they know better than their bosses how to perform their duties." (internal quotation marks and citations omitted)).

The *Garcetti* inquiry is driven by facts, and the plaintiff has identified no case law showing that on these facts it was clear that he spoke as a citizen. Neither can I

find any, and *Brtalik* points in the opposite direction. As a result, the defendants could have read plaintiff's May 2007 e-mail and its December 2005 attachment and reasonably concluded that he was speaking as an employee.

■ Furthermore, these e-mails do not relate to a matter of public concern. Here *Ezekwo* more or less controls. In that case, the plaintiff was a resident at a New York hospital who received a number of poor evaluations from superiors. During her residency she wrote prolifically about problems within her workplace, covering such topics as her superiors' poor management, their failure to competently evaluate her performance, their lack of teaching ability, the scarcity of opportunities to perform surgery, and retaliation against her based on her race, gender and criticism of the program. *Ezekwo,* 940 F.2d at 777–78. She directed her complaints to her supervisors, to her collective bargaining agent and to the hospital's equal employment opportunity officer. *Id.* After leaving the program, she brought suit alleging that the defendants had retaliated against her based on protected speech.

Not so, held the Second Circuit. The plaintiff's grievances had been a calculated response to her poor evaluations, not an attempt to debate public issues. "The mere fact that one or two of Ezekwo's comments could be construed broadly to implicate matters of public concern," wrote the Court, "does not alter the general nature of those statements." *Id.* at 781. And in general, "[h]er complaints were personal in nature and ... related to her own situation within the ... residency program." *Id.* The plaintiff was "not on a mission to protect the public welfare .... [r]ather, her primary aim was to protect her own reputation and individual development as a doctor." *Id. See also Ruotolo v. City of New York,* 514 F.3d 184, 189–90 (2d

Cir.2008) ("Ruotolo's lawsuit sought to redress his personal grievances. It did not seek to advance a public purpose.... The acts of alleged retaliation ... bear upon the circumstances ... of his employment, such as reassignment, transfer, time off, and discipline.").

So too in this case. Though several of plaintiff's remarks, "construed broadly," might "implicate matters of public concern"—the proper handling of controlled substances, the humane treatment of animals—his e-mails as a whole seek relief for personal grievances. The thrust of his messages was that his career had stalled because his unqualified supervisors had it out for him and OACE could remedy the situation by offering him a new position. The overriding concern in these e-mails is plaintiff's career, not the appropriate storage of veterinary drugs or the right way to euthanize a rabbit.

This is not to say that plaintiff's motivation in speaking is dispositive. The law makes clear that it is not. *Huth*, 598 F.3d at 74. It is plaintiff's private aim in combination with the personal nature of his complaints and the merely incidental references to drug registration and animal welfare that must be considered. Given this combination of factors, it must be concluded the e-mails air private grievances, not public issues, and as a result they do not support a First Amendment claim.

### 2. *June 21, 2008 E-mail*

The plaintiff's final e-mail alerted a member of OACE to trouble with the OARS mouse cages. In two cages, the Autowater system was not functioning properly. As a result, mice in those cages had become dehydrated and tried to eat each other. ECF No. 42, Ex. 9 at 1. Plaintiff told the OACE member about the mice and advised that OARS did not have

enough technicians to adequately monitor them.

As discussed in Part III.D., *supra*, plaintiff's reporting duties after January 2006 are disputed. And it is not obvious that his concerns about the mice (unlike his concerns about rabbit euthanasia) were incidental to his duties as a Clinical Veterinarian. His e-mail indicates that he was "called in [to the lab]" because of "two dehydrated mouse cages," but the record does not clearly demonstrate that he was under a duty to inform OACE of his observations and opinions. In light of this, it cannot be concluded as a matter of law that in this instance plaintiff spoke as an employee.

The defendants, however, could reasonably have concluded that plaintiff's e-mail did not relate to a matter of public concern. Plaintiff argues that his speech concerned the public because it touched on issues of animal welfare. But the e-mail describes an isolated incident in which mice in two cages became dehydrated and includes one sentence attributing the occurrence to a larger issue. *Id.* ("To me, OARS is short staffed on technicians ... to monitor the mice, etc."). This is not an instance in which the plaintiff sought to expose or correct "pervasive" or "systemic" problems within OARS. *See Saulpaugh*, 4 F.3d at 143 (quoting *Yatvin*, 840 F.2d at 420). Nor is it a case in which he tried at length to bring widespread abuses in the lab to public attention. *See Rambaldi*, 2003 WL 23744272, at *8. It is rather an occasion, doubtless similar to thousands that arise within public institutions from day to day and week to week, in which the plaintiff mentioned in passing a troubling but resolvable issue and suggested how to fix it.

*Pickering* reflects the simple truth that if government is to go on, not every remark about the functioning of its institu-

tions can carry constitutional significance. I need not decide if this particular remark is among the set that does. When plaintiff sent his last e-mail to OACE, no case clearly established that his observations about Autowater systems and his opinion on OARS staffing related to a matter of public concern. The defendants are therefore protected by qualified immunity.

## IV. *Conclusion*

Accordingly, the defendants' motion for summary judgment is hereby granted.